In the Matter of the EQUITABLE RESERVE FUND LIFE ASSOCIA-
TION of the City of New York.

In a proceeding to wind up the affairs of a dissolved corporation, organ-
ized under the act (Chap. 175, Laws of 1883, as amended by chap. 285,
Laws of 1887) providing for the incorporation of co-operative or assess-
ment life and casualty insurance associations, the following facts appeared:
The constitution of said corporation provided for the creation of a death
fund and a reserve fund, both of which were distinct. It also provided
that no death claim, which claim the company agreed should be paid
from the death fund, should become otherwise due or payable, except in
a contingency which did not happen. The reserve fund was to be
deposited in trust for certain purposes specified, which were for the
benefit of living members. If the death fund was insufficient to pay all
death claims each claimant was to receive a *pro rata* share thereof with
other claimants. The death fund being insufficient to pay all death
claims the holders asserted the right to resort to the reserve fund for
the payment of the balance of their claims. *Held*, untenable; that the
ultimate destination of the two funds was not altered by the dissolution
of the company, and the holder of a death claim had no right to demand
payment from any other than the death fund; that the reserve fund was
not assets of the company within the general meaning of the term, but
was more in the nature of a trust fund, and so when the company was
dissolved was not to be disposed of under the rules of law governing
the distribution of assets of insolvent corporations.

The constitution of the company permitted its board of trustees in their
discretion to use securities forming the reserve fund " to meet any want
or necessity of the association which may hereafter arise by reason of
unforeseen emergencies." *Held*, that this only applied while the com-
pany was alive and in the hands of its board of trustees, and so had no
effect upon the disposition of the funds after its dissolution.

*O'Brien* v. *Home Benefit Society of N. Y.* (117 N. Y. 310); *Darrow* v. *Family
Fund Society* (116 id. 537), distinguished.

The reserve fund was made up principally from the death assessments, a
percentage of which was by the terms of the constitution required to be
transferred to that fund, and which was for the benefit of members who

had paid all assessments. Thirty-four assessments had been made and paid by some of the certificate holders before any legal proceedings were instituted for the dissolution of the company; this was asked for on the ground that the business was being carried on fraudulently. A temporary receiver was appointed, and at his instance the corporation and its officers were enjoined from collecting any debt or demand, or paying out or transferring any moneys of the company. The receiver obtained permission to, and did make an assessment. Only part of the holders of certificates who had paid the prior assessments pàid this one, and those who made the payments claimed that they alone were entitled to share in the reserve fund. *Held,* untenable; that under the circumstances there was no absolute and legal duty resting upon the certificate holders to pay the last assessment to entitle them to any benefit to be derived from the reserve fund; that the assessments provided for by the constitution were those made by the officials of the company, acting under its constitution and by-laws, and not to one made simply under the direction of the court; that those who paid the last assessment were entitled to have the amount paid by them repaid in full from the death and reserve funds in the proportion each received of such assessment, and those who paid the assessments prior to that and who were living when these proceedings were commenced, and the representatives of those who have since died were entitled to share in the reserve fund *pro rata,* according to the amount each has contributed; that the date to determine the rights of claimants in the reserve fund was the date of the commencement of the proceedings for dissolution.

*People* v. *Security Life Ins. & An. Co.* (78 N. Y. 115), distinguished.

Also *held,* that the holders of death claims must have their *status* defined as of the date of the commencement of the proceedings; that certificate holders dying after that date had no claim upon that fund, but their representatives were entitled to share in the reserve fund.

Prior to the thirty-third assessment, all assessments had been made as a death occurred for the purpose of paying that particular death; the constitution was then amended and assessments directed to be made bi-monthly for the full amount allowed by the constitution, without reference to the death claims existing. The death claim of one H. had been approved by the executive committee prior to the levying of the thirty-fourth assessment, as were also three other claims, two of which were paid in full before the company went into the receiver's hands. All of the fund collected from the thirty-fourth assessment passed into the hands of the receiver. Under the constitution, death claims were to be paid within three months after satisfactory proof of death and the approval of the claim by the executive committee. The receiver was appointed within three months after the H. claim was so approved. The beneficiary thereunder claimed to be entitled to a preference. *Held,* untenable; that he was entitled simply to share *pro rata* with other claimants in the death fund.

Also *held*, that the expenses of the winding up of the company, including the receiver's commisssions, should be paid *pro rata* by the two funds.

(Argued February 8, 1892; decided March 1, 1892.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made November 11, 1891, which modified, and affirmed as modified, an order of Special Term, confirming the report of a referee appointed to take proof and report as to the distribution of the assets of the Equitable Reserve Fund Life Association of the city of New York upon its dissolution.

This association was incorporated on the 17th day of May, 1883, under and by virtue of chapter 175 of the Laws of 1883, passed April second of that year, and entitled "An act to provide for the incorporation and regulation of co-operative or assessment life and casualty insurance associations and societies." This act was amended by chapter 285 of the Laws of 1887.

The corporation has been dissolved and a receiver appointed to distribute its funds among those entitled thereto. Disputes have arisen as to the respective rights of parties claiming an interest in the funds in the hands of the receiver of the dissolved corporation, the chief question being as to the proper application of the two funds called the "death fund" and the "reserve fund." The company adopted a constitution and a set of by-laws, and used a form of certificate of membership under which people became insured. It continued business from the time of its incorporation until the 18th of September, 1889, when, upon the application of the attorney-general, a temporary receiver was appointed and the officers of the company enjoined from meddling with its funds. The receiver remained in charge of the company under this appointment until the 9th of November, 1889, when the company was formally dissolved and a decree to that effect duly entered, and the temporary was appointed the permanent receiver to distribute the effects of the company among those entitled thereto. The company was dissolved on the ground that it had been

conducting its business fraudulently, which, by the thirteenth section of the act of 1883, as amended by the act of 1887, was made a ground for dissolving a corporation formed under such acts, upon the application of the attorney-general.

The association had no capital stock, and its only means of paying its expenses and the claims against it arose from admission fees, annual dues and assessments. It is in respect to the moneys collected from assessments that the principal questions here arise. The constitution stated that the object of the association was "to advance the welfare of its members and to provide pecuniary indemnity upon a member's decease, to his family or others dependent upon him, or to such other person or persons as shall have been duly designated by him." (Art. 1, § 2.)

All persons becoming members were required to "comply with and be subject to all the requirements for membership set forth in the constitution, by-laws and certificate of membership." (Art. 2.)

The agency and general expenses of the business of the company were provided for by the admission fees and annual dues from members, and such fees and dues were to be graded according to the amount of benefit called for, and were to be prescribed in the certificate. (Art. 8.)

The following sections from different articles of the constitution have been specially alluded to and urged as material in the various arguments of counsel. Section 1 of article 6 is as follows:

"BENEFITS.

"SECTION. 1. Upon the death of a member during the continuance of his or her certificate in full force, the association shall, within three months after due notice and satisfactory proofs of such death, and the approval thereof by the executive committee, pay to the beneficiary named on the books of the association, if such beneficiary be living at the time of such member's death, otherwise to the heirs or legal representatives of such deceased member, the amount to which the same may appear entitled, according to the books of the asso-

ciation and the terms of the certificate of membership, out of the death fund (hereinafter defined) of the association ; or if the death fund shall then be insufficient to pay the whole of any such claim, then, *pro rata*, with other claims out of the moneys to be realized to said death fund from an assessment to be made as hereinafter described -- provided, however, that there shall be first deducted therefrom any counter-claim or indebtedness due from said member to the association. *And no death claim shall become otherwise due or payable except from the reserve fund, as hereinafter provided.*"

## "ARTICLE VII.

### "ASSESSMENTS.

" SECTION 1. Assessments shall be levied bi-monthly on the second Tuesdays of February, April, June, August, October and December in each year for such a sum as may be deemed by the executive committee of the board of trustees to be necessary to meet the claims outstanding and not previously assessed for, but such assessments shall not exceed in the aggregate the amount stated in the third section of this article.

" SEC. 2. Should the amount realized by any such bi-monthly assessment, after providing for the reserve fund and contingent fund as hereinafter stated, be insufficient to meet the claims for which the same was levied in full, then it shall be apportioned as provided in article VI, section 1 of this constitution.

" SEC. 3. The aggregate assessments in any one year shall not exceed the net cost of insurance upon the membership in force at the face value of the certificates, according to the American Experience Table of Mortality, with an addition thereto not exceeding forty per centum thereof to provide for the reserve fund (hereinafter defined), and for the expenses of levying assessments, and for investigating, adjusting and contesting doubtful, illegal or fraudulent claims. Such expenses shall not exceed five per centum of the total assessments so levied, which percentage may be set apart for those purposes, as a contingent fund, from the gross proceeds of said assess-

ments. Such further assessments in excess of the foregoing, may, however, be levied as may be rendered necessary by any law or laws of the state of New York, now or hereafter enacted.

"SEC. 4. *     *     *.

"SEC. 5. Twenty-five per centum of the proceeds of each death assessment shall be transferred from the assessment account to the reserve fund account. This amount and interest thereon, together with the net earnings of the association, shall constitute a reserve fund. No part of the reserve fund shall be used for the payment of expenses.

"SEC. 6. *The balance of each net death assessment, after provision for the contingent fund and transfer to the reserve fund*, shall be transferred from the assessment account above specified to the death fund account, *and from this account death claims shall be payable.*

"SEC. 7. The board of trustees shall designate some bank or trust company, in which all sums transferred to the death fund account shall be deposited for the settlement of death claims under the certificates of the association, which shall be payable in the manner hereinbefore provided.

"SEC. 8. The board of trustees shall designate some trust company or companies, bank or banks, with which the reserve fund shall be deposited, when not otherwise invested. The reserve fund may be invested by the board of trustees in good securities of the character prescribed by law, and may be used in the discretion of the said board to make any deposits required or allowed by the laws or usages of this or any other state, or to meet any want or necessity of the association that may hereafter arise by reason of unforeseen contingencies.

"SEC. 9. After the continuance of each certificate for a period of five years and every fifth year thereafter an apportionment of the reserve fund shall be made to the holders of such certificates upon such basis and principles as the board of trustees shall deem safe and equitable.

"The sum so apportioned to each certificate holder shall be applicable ten years from the date of such apportionment.

towards paying future dues and assessments under such certificate; provided, however, that should membership under a certificate cease by death or otherwise, the amount of such apportionment remaining unapplied shall be withdrawn from said certificate and shall be apportioned as above provided at the next quinquennial apportionment to members holding certificates issued in the same year as the aforesaid certificate.

"SEC. 10. The reserve fund in excess of $100,000 and in excess of the aggregate amount apportioned to members as aforesaid, may, in the discretion of the board of trustees, be applied in settlement of death claims in excess of the American Experience Table of Mortality, or towards making up any deficiency that may then exist in the death fund."

By-laws were adopted, but they are not deemed of importance with regard to the questions raised and decided herein.

When the company first commenced to do business it made assessments whenever a death occurred, and the funds were collected for the payment of the special claim arising from each death loss. The assessment was for the particular death. On the 12th of March, 1889, the constitution was amended in that particular so as to read as set forth in the first section of article 7, and without reference to any particular death.

Each member took his certificate, paid his assessments and continued his membership with reference to the recognized power of the company at the proper time and in the regular way to amend its constitution and by-laws.

The following are the material provisions of the certificate issued by the company to the parties it insured:

"And the said association agrees that within ninety days after the receipt of due notice and satisfactory proofs of the death of the above named member during the continuance of this certificate of membership, there shall be payable to of        county of        state of        if then living, otherwise to his heirs or legal representatives of said member, the sum of        dollars        from the death fund (hereinafter defined) of the association at the time of such death, or from moneys that shall be realized to said death fund from the next assess-

ment, to be made as hereinafter provided; *and no claim shall be otherwise due or payable, except from the reserve fund, as hereinafter provided.*

"It is understood and agreed that upon the occurrence of a death among the membership, an assessment may be made upon the entire membership for such a sum as has been established by the board of trustees, according to the age of each member at admission and the amount of his certificate, as per table indorsed thereon, which forms part hereof. Seventy-five per cent of the sum realized from each assessment shall constitute the death fund of the association, hereinbefore referred to, and be available solely and exclusively in settlement of death claims, as above provided. The residue realized from each assessment, namely, twenty-five per cent, together with the net earnings of the association, shall be deposited in trust with a trust company, and shall be invested in trust for the benefit of the members of the association in such investments as are now or may be hereafter authorized by law, and shall constitute the reserve fund hereinbefore referred to, the interest on which, as it accrues, shall be placed by the said trustee to the credit of the death fund.

"The reserve fund above $100,000 and in excess of the aggregate amount represented by outstanding bonds, shall be applicable in settlement of claims in excess of the American Experience Table of Mortality, and when any claim by death is due to making up any deficiency that may then exist in the death fund.

"After the continuance of each certificate for a period of five years, and every fifth year thereafter, a bond (bearing interest at a rate to be fixed by the trustees, payable annually to the death fund) will be issued for such amount as shall, by an apportionment of the reserve fund upon such basis and principles as the trustees shall deem safe and equitable, be allotted it, the principal of which bond shall be applicable ten years from its date towards paying future dues and assessments under such certificate, provided, however, that should membership under a certificate cease by death or otherwise,

any bond issued thereunder shall immediately become and be null and void, and any portion of the principal thereof not so applied shall be apportioned, as above provided, at the next quinquennial apportionment to members holding certificates issued in the same year as the aforesaid certificate, and at any apportionment of the reserve fund, the rate of future mortuary assessments may be changed to conform to the actual mortality experience of the association, if such change shall to the trustees seem necessary or expedient. Upon the death of a member, a mortuary assessment shall be made (but not more than one for each death) when the death fund is not sufficient to meet the claim thereby arising."

Further facts are stated in the opinion.

*Lucius McAdam* for appellants. In this case the reserve fund as well as the death fund sprang out of the mutual contract of the members, as expressed in the certificates and in the constitution and by-laws, and the uses of each are therein expressly defined and limited. It becomes, therefore, the duty of the court to enforce the provisions of the contract made between the members, and not to substitute therefor an entirely different one evolved from the erroneous application of ancient and irrelevant cases. (*Luhrs* v. *Luhrs*, 123 N. Y. 367; *Hellenburg* v. *District*, 94 id. 580.) As a matter of common sense and justice arising from the agreement made by and with the members in their certificates and in the constitution and by-laws which form part thereof, the referee properly awards the death fund to the death claimants and the reserve fund to the living members. (*Atty.-Gen.* v. *N. A. L. Ins. Co.*, 82 N. Y. 172.) The valuation of certificates proposed by the order of the General Term is erroneous and impracticable. (*Burden* v. *M. S. F. Assn.*, 1 Lawyer's Rep. 146.) Those who paid the thirty-fourth assessment are entitled to share in the reserve. (*In re Berry*, 26 Barb. 55; *Atty.-Gen.* v. *N. A. L. Ins. Co.*, 82 N. Y. 186; *Atty.-Gen.* v. *G. L. Ins. Co.*, Id. 336.)

*Samuel H. Benton* for appellants. The scheme of the Equitable Reserve was co-operative insurance for mutual bene-

fit. (Laws of 1883, chap. 175; 2 May on Ins. § 550.) The relation between the Equitable Reserve and its certificate holders was that of parties to contracts of life insurance. (*Commonwealth* v. *Wetherbee*, 105 Mass. 149, 161; *Grossman* v. *Supreme Lodge*, 13 N. Y. S. R. 596; *Benefit Assn.* v. *Barkhart*, 110 Ind. 189; *Numrich* v. *Supreme Lodge*, 3 N. Y. Supp. 552.) The members of the Equitable Reserve were not partners. (*People* v. *S. Ins. Co.*, 78 N. Y. 114; *Cohen* v. *N. Y. M. Ins. Co.*, 50 id. 610.) The frauds of the officers of the company, which caused its insolvency and dissolution, constituted a breach of its contracts of insurance, and its certificate holders became claimants for damages. (*Darrow* v. *F. F. Society*, 116 N. Y. 537; *O'Brien* v. *H. B. Society*, 117 id. 310; *People* v. *S., etc., Life Ins. Co.*, 78 id. 114, 125.) The measure of damages in each case is the value of the insurance destroyed. (*O'Brien* v. *H. B. Society*, 117 N. Y. 310, 318, 319; *People* v. *S. Ins. Co.*, 78 id. 124.) The General Term erred in holding that the value of the Schulte certificate was the cost of reinsurance in a similar company at the same rate of liability to assessment. The death of Schulte three days after dissolution fixed the value of his certificate, and it should be so estimated. (*Speir* v. *P. M. Ins. Co.*, 36 Hun, 322; *People* v. *K. Ins. Co.*, 38 id. 601; *People* v. *S. Ins. Co.*, 78 N. Y. 129; *Lovell* v. *S. L. Ins. Co.*, 111 U. S. 264.) The General Term properly held that the reserve fund was not held in trust for any class, but constituted general assets by the failure on the dissolution of the corporation of the object for which it was created. (*People* v. *S. Ins. Co.*, 78 N. Y. 123.) The referee's scheme of distributing the reserve fund by handing back to certificate holders their assessments, or a dividend on the amount thereof, which was approved by the Special Term, and overruled by the General Term, is founded upon the case of *Burdon* v. *Massachusetts Safety Fund* (147 Mass. 360), which does not support it. (*Briggs* v. *Earl*, 139 Mass. 473; Laws of 1885, chap. 183, § 2; Laws of 1888, chap. 429, § 15.)

*Geo. C. Holt* for appellants. No living certificate holders, except those who paid the last assessment, are entitled to share in the reserve fund. (*McDonald* v. *Ross*, 29 Hun, 87.) Death claims are not entitled to share in the reserve fund. (*Sanger* v. *Rothschild*, 50 Hun, 157 ; Laws of 1883, chap. 175 ; Laws of 1887, chap. 285, § 6 ; *Burden* v. *M., etc., Assn.*, 147 Mass. 360 ; *In re B., etc., Co.*, 47 L. J. Ch. 318 ; *Wadsworth* v. *J., etc., Co.*, 9 N. Y. Supp. 711 ; *Bessinger* v. *H., etc., Assn.*, 43 N. W. Rep. 481.)

*F. R. Minrath* for appellants. Death claims are debts of the association and must be paid in full before living certificate holders are entitled to any part of the funds. (*Vannata* v. *M. L. Ins. Co.*, 31 N. J. Eq. 15 ; *People* v. *S. L. Ins. Co.*, 78 N. Y. 129 ; *Sterling* v. *M. Ins. Co.*, 32 Penn. St. 75 ; *A. Ins. Co.* v. *Swift*, 10 Cush. 433 ; *N. E. Ins. Co.* v. *Butler*, 34 Me. 451 ; *Burden* v. *M. S. F. Assn.*, 147 Mass. 360.) Inasmuch as insolvency of this corporation does not relieve its surviving members from further assessments, they should be assessed until the death fund thus created becomes sufficient to meet all claims, yet, to avoid the circuity of action, this procedure should be dispensed with, and the entire funds be first applied in payment of death claims. The receiver has the power to levy assessments sufficient to pay the death claims existing at time of his appointment. (*Commonwealth* v. *M. M. Ins. Co.*, 112 Mass. 116 ; *Lawrence* v. *Nelson*, 21 N. Y. 158 ; *N. H. M. Ins. Co.* v. *Rand*, 24 N. H. 428 ; *N. E. Ins. Co.* v. *Belknap*, 9 Cush. 140 ; *A. M. Ins. Co.* v. *Swift*, 10 id. 433 ; *Mayer* v. *Atty.-Gen.*, 32 N. J. Eq. 815–820.) In any event the death claimants are entitled not only to the entire death fund, but to their *pro rata* share in the so-called " reserve fund," on the basis of the fair value of their claims equally with the living certificate holders. (*Lueders* v. *H. Ins. Co.*, 4 McCrary, 149 ; *A. L. Ins. Co.*, L. R. [9 Eq.] 706 ; *Bell's Case*, Id. 717.)

*Henry C. De Witt* for respondent. The death fund realized from each assessment was held in trust for payment of

death claims. (Story's. Eq. Juris. § 1195 ; *In re P. L. Ins.
Co.*, 9 Biss. 188; *Fisher* v. *Andrews*, 37 Hun, 176 ; *Wilber* v.
*Torgerson*, 24 Ill. App. 119 ; *Mayer* v. *E. L. Assn.*, 42 Hun,
237; *Levett* v. *C. M., etc., Co.*, 78 Me. 541.) Proceeds of
each assessment under the constitution are a trust fund for
payment of the death claims for which such assessment was.
levied. (Niblack on Mut. Ben. Soc. § 147.)

*Henry C. De Witt* for Theodore A. Siebler, Jr., respondent.
The exception and reservation contained in the release given
by this claimant is legal and valid. (*Comstock* v. *Hier*, 73
N. Y. 269 ; *Stewart* v. *Eden*, 2 Caines, 121, 128 ; *McIntyre*
v. *Williamson*, 1 Edw. Ch. 34 ; *Murray* v. *Fox*, 104 N. Y.
382 ; *Jackson* v. *Stackhouse*, 1 Cow. 182.) This appellant is
entitled to share in the reserve fund of the association. (Bacon
on Ben. Soc. §§ 62, 69 ; *Vannata* v. *N. J. M. L. Ins. Co.*, 31
N. J. Eq. 15.) Death claims which accrued before the
appointment of the receiver of the association, are entitled to
payment before any distribution of the assets among the hold-
ers of running certificates in the association, except as pro-
vided for in the decision and order under review. (*Vannata*
v. *N. J. M. L. Ins. Co.*, 31 N. J. Eq. 15 ; *People* v. *S. F. L.
Ins. Co.*, 78 N. Y. 114; *Commonwealth* v. *M. M. Ins. Co.*,
112 Mass. 116; Bacon on Ben. Soc. § 479.) The plan or
scheme of the company and its members in regard to the
reserve fund having been frustrated by the insolvency, dissolu-
tion and appointment of a receiver of the association, the law
should prescribe the respective rights of the association and
its members with respect to the reserve and death funds of
the association, according to dictates of justice, that is, of
equality. (*Romeyn* v. *Sickels*, 108 N. Y. 650 ; 13 N. Y.
S. R. 864; Addison on Cont. 22 ; *Zimmer* v. *Settle*, 35
N. Y. S. R. 218 ; *Hildreth* v. *Buell*, 13 Barb. 107 ; *Jones* v.
*Judd*, 4 N. Y. 412.) This equality and justice does not
require that the division and distribution of the assets and
funds of the association should be made at the same time or
on the same basis. (*N. H. M. Ins. Co.* v. *Hand*, 24 N. H.

428; *Sterling* v. *M. Ins. Co.*, 32 Penn. St. 75; *A. Ins. Co.* v. *Swift*, 10 Cush. 433; *N. E. Ins. Co.* v. *Butler*, 34 Me. 451; *Orr* v. *M. C., etc., Co.*, 114 Penn. St. 387; *Wardle* v. *Townsend*, 75 Mich. 385; *L. V., etc., Co.* v. *Dryfoos*, 9 Atl. Rep. 262; *Hens* v. *Boyd*, 1 Sandf. 481, 483; *Lawrence* v. *Nelson*, 21 N. Y. 158, 160; 32 Penn. St. 75; 10 Cush. 433; 34 Me. 451; *Commonwealth* v. *M. M. Ins. Co.*, 112 Mass. 116, 120; *Woodruff* v. *E. R. Co.*, 93 N. Y. 609.) The discretion reposed in the officers of the association, in regard to the application of the reserve fund, was not an arbitrary one, to be exercised or not as they choose, but was subject to revision by the court. (*Dennis* v. *M. H. B. Co.*, 120 N. Y. 496; *Crossman* v. *M. B. Assn.*, 9 N. E. Rep. 753.) There is a distinction between the rights of death claimants existing before the appointment of the temporary receiver and those whose claims arose after such appointment. (Code Civ. Pro. §§ 1788, 1789; *In re Berry*, 26 Barb. 55, 60, 61; *Commonwealth* v. *M. Ins. Co.*, 119 Mass. 45.) If the court holds that the death claimants are not entitled to a preference, as we claim for them, then they are entitled to the whole of the death fund, and so far as it fails to meet such claims, they are entitled to participate in the reserve fund (on the basis of such remainder) *pro rata* with the others entitled thereto. (Bacon on Ben. Soc. § 480; *Vannata* v. *N. J. M. L. Ins. Co.*, 31 N. J. Eq. 15; *Commonwealth* v. *M. M. Ins. Co.*, 112 Mass. 116, 120; *A. Ins. Co.* v. *Swift*, 10 Cush. 433; *M. Ins. Co.* v. *Fuller*, 8 Allen, 274; *Sterling* v. *M. Ins. Co.*, 32 Penn. St. 75; *N. E. Ins. Co.* v. *Butler*, 34 Me. 451; *People ex rel.* v. *Keese*, 27 Hun, 483; *Robertson* v. *Bullion*, 11 N. Y. 243; *Grane* v. *P., etc., Society*, 36 id. 11; *Thomas* v. *Wallore*, 31 Barb. 172.) The policies issued to Charles Hibbard, also the policies issued to O. S. Bogert are void, and in no event should they be allowed, for the reason that each of said certificate holders was an officer of the association, and thereby incapacitated from receiving insurance therein. (*Pratt* v. *D. H. M. Ins. Co.*, 53 Hun, 101; 6 N. Y. Supp. 78.)

*Raphael J. Moses* for respondents.   The General Term is
in error in supposing that the Court of Appeals had held that
the value of a policy in a life insurance company on its disso-
lution was such a sum as would be sufficient to obtain a similar
insurance at the same rate of premium or assessment in another
similarly organized association.   (*Attorney-General* v. *M. L.
Ins. Co.*, 82 N. Y. 338.)   The General Term is in error in
saying, " that the result which followed the dissolution of the
company and its disability to levy assessments is that the
death claims arising prior to the dissolution of the association
have been paying less than a moiety of their amount," the
word " amount " being used as the equivalent of a legal claim.
(*Darrow* v. *F. F. Society*, 116 N. Y. 541; 24 Fed. Rep. 685;
5 McCreary, 485; 71 Iowa, 689; 72 id. 193; Id. 242; 68
Cal. 392; 48 Conn. 98; 9 Biss. 196.)   The General Term com-
mitted error in not setting apart and returning to the members
the $7,049.50 realized on the thirty-fifth assessment.   The
only right to call for such assessment was a part of the scheme
of a going company.   (*In re P. Ins. Co.*, 9 Biss. 197; *In re
Berry*, 26 Barb. 55.)

*Henry H. Whitman* for receiver.   Death claimants as such
are not entitled to share in the distribution of the reserve
fund.   (Laws of 1883, chap. 175; Laws of 1887, chap. 285;
*Lawrence* v. *Nelson*, 21 N. Y. 158; *Burdon* v. *M. S. F.
Assn.*, 147 Mass. 360.)   The reserve fund should be distrib-
uted among those members of the association who paid the
thirty-fifth assessment, in proportion to the amount which each
of those members paid into the association on account of
assessments.   (*Atty.-Gen.* v. *G. M. L. Ins. Co.*, 82 N. Y. 336;
*People* v. *E. M. L. Ins. Co.*, 92 id. 105; *Schimpf* v. *L. V.
M. Ins. Co.*, 82 Penn. St. 373; *People* v. *S. L. Ins. Co.*, 71
N. Y. 222; *Atty.-Gen.* v. *C. L. Ins. Co.*, 88 id. 77; *People* v.
*K. L. Ins. Co.*, 34 Hun, 476; *Lawrence* v. *Nelson*, 21 N. Y.
158.)   Only those claimants under certificates, the holders of
which died prior to the 9th day of November, 1889, are entitled
to a share in the death fund; and all members of the associa-

tion who died after that date are not entitled to share in the death fund, but the representatives of such members, provided the latter had paid all assessments levied on them, are entitled to take the same share which the deceased member would take if living. (*People* v. *S. L. Ins. Co.*, 71 N. Y. 222.)   The valid claims of the general creditors of the association, and all the expenses incurred by the receiver in the course of winding up the association and the distribution of its fund should be shared by the death fund and reserve fund in proportion to their respective amounts. (*Atty.-Gen.* v. *N. A. L. Ins. Co.*, 89 N. Y. 94.)

Peckham, J.   This is the first appeal which has come to this court in a proceeding to wind up a dissolved corporation that was originally organized under chapter 175 of the Laws of 1883, as amended in 1887.

The companies so organized are neither stock nor exactly mutual insurance companies.   While partaking generally of the features of a mutual company, they could not be exactly described as such in all respects.   Co-operative or assessment companies they are designated in the statute, and at any rate the rights of the members, when the company has been dissolved, have never up to this time been the subject of our investigation.   The statute provides for the incorporation of companies for the purpose of transacting the business of life or casualty insurance upon the co-operative or assessment plan, and in section 5 of the act, a description of what constitutes such plan may be found.

It is admitted that this company comes within that description.   In such case the liability of the company and the rights of its members must be measured and construed by the constitution and by-laws of the company and the certificates which it issued.

*First.* The chief and important question arising here is as to the rights of the holders of what are designated as death claims.

The death fund is not sufficient to pay all the claimants in full, and those claimants demand the right to resort to the

so-called "reserve fund" for the payment of the balance of their claims.

The General Term, reversing in this respect the ruling of the Special Term and of the referee, has held that the reserve fund was the property of the association at the time of its dissolution, and it thereupon became available to meet all the unsatisfied debts and obligations of the association, and among such debts were the demands owned by persons in whose favor death claims accrued and which had not been wholly paid by the amounts received from the death fund. Such persons were held to be creditors of the company and entitled to be satisfied, so far as the assets were sufficient for that purpose, equally with other creditors having demands against the company. Such claimants were given the right of exclusive resort to the death fund, and if that fund did not suffice to pay them in full, then they were at liberty to come to the reserve fund and demand payment from it in common with the other creditors.

In determining the correctness of this view the fact must not be lost sight of that the question is not to be determined upon general principles of equity in distributing the funds of an insolvent estate. The rights of the parties are to be decided with reference to the constitution and by-laws and the contents of these certificates, all of which taken together form the contract between the company and the certificate holders. If the contract be in terms silent in regard to any particular question, a provision in regard to it may be implied under the same circumstances that an implication would arise in any other contract. The contract is the standard by which to determine the rights and liabilities of the parties thereto. (*People ex rel. Meyers* v. *Masonic Guild, etc., Assn.*, 126 N. Y. 615.)

We are, after much examination of the question, convinced that the reserve fund is not in any event liable to be called upon for payment to those holding death claims.

As a "going concern," the company provided in its constitution for the creation of two distinct funds, and we do not think the ultimate destination of those funds was altered by the dissolution of the company. The company agreed to pay death

claimants from a fund called the death fund, and no death claim was by the terms of the constitution (Art. 6, § 1) to become *otherwise* due or payable except from the reserve fund under the circumstances thereafter mentioned, which were when such fund arrived at the amount of $100,000, which it never did. Taking this provision alone and I do not see how the holder of a death claim can found a right to demand payment from any other than the death fund. There is nothing in the article of the constitution or in the circumstances surrounding its adoption that would enable us to say this provision would not obtain in case the company were dissolved. Of course, it was adopted with reference to the idea that it was to provide for a going concern, but when it carefully creates a separate and distinct fund for the payment of death losses and plainly announces that the holder of a death claim shall look to no other fund for its payment (except upon a contingency which has not arisen), it seems to us that such condition attends upon the claim at all times, even when presented to a receiver of the dissolved corporation. If it were not so to be regarded it would seem that some provision altering or annulling the condition upon the dissolution of the company would naturally have been adopted.

It lies with those who claim the abolition of this condition to show it or else to show clearly that it was intended solely for application to a living company. This death fund was to be formed by depositing therein seventy-five per cent of the amount of each assessment levied for the purpose of paying death claims, and if the fund were not enough to pay the whole of a death claim, the claimant was to receive a *pro rata* share thereof with other claimants. There was never a legal right to be paid in full under all circumstances. The balance of twenty-five per cent of the proceeds of each death assessment was to be transferred to the reserve fund, no part of which was to be used for expenses, but after it reached $100,000 in amount, the excess could be used as provided for by section 10 of article 7 of the constitution.

The constitution also expressly provided for the uses to which

the reserve fund could be put.   They were specified in article 7, particularly in section 9.   Briefly stated, the fund was for the purpose of enabling those who remained certificate holders at the time when an apportionment should be made, to procure or rather retain insurance by the aid of that fund.   Those living certificate holders who had an interest in the reserve fund could not retain it unless they continued living members at the time of an apportionment, and paid all assessments.   By their death before that time they forfeited all their claims to any portion of the fund and their beneficiaries or personal representatives were relegated to the death fund for the payment of their claims.

It is true there is no provision which in terms states that upon the dissolution of the company the reserve fund shall be distributed to those who are living and are the holders of certificates and are in good standing, with all assessments paid. The fund was created for the purpose of aiding those persons to pay for their insurance who should, after the lapse of a certain number of years, be then the owners of certificates. If a man died he lost his chance or right to participate in the benefits to be derived from the existence of this fund.

Hence it was essentially a fund for the assistance of the living to the entire exclusion of the claims of those who represented deceased members.   When the company is dissolved and it appears that the general purpose of the fund cannot for that reason be accomplished, we do not know upon what principle the claim can be founded that it must in that event be distributed, not to those living members who at that moment represent the persons for whom the fund was created, but that it must go to pay all creditors, because it represents assets of the company.   This would be a most wrongful conversion of the fund from its original purpose.

The argument seems to be that on account of the failure of the company the purpose of the fund cannot be fully met and accomplished, therefore it shall be put to uses for which it was never intended and which are wholly inconsistent with and opposed to such original intention.   This is the practical result

of the claim which is based upon the fact that the constitution does not in terms provide for this fund upon a dissolution of the company.

But when it is found that the constitution expressly limits the right of a holder of a death claim to payment from the death fund, with an exception not material here, and when it is also found that the reserve fund was created for a special purpose, and that no death claimant could resort to it upon any pretext until it reached $100,000 we are of the opinion that the purpose of the reserve fund is so far made plain that there is no doubt of the right of the living certificate holders at a particular date to share among themselves the moneys remaining in that fund. The fund is not assets of the company within the general meaning of that term. It is more in the nature of a trust fund. We do not think that section 8 of article 7 of the constitution is applicable to this state of affairs. That section permits the board of trustees, in their discretion, to use the securities in which the moneys forming the reserve fund had been invested for the purpose of making any deposits required or allowed by law or usage of this or other states, "or to meet any want or necessity of the association that may hereafter arise by reason of unforeseen contingencies." The true meaning of the latter part of the section is not entirely plain; but the want or necessity spoken of must arise by reason of unforeseen contingencies and while the company is alive and in the hands of its board of trustees, for the question of the application of the securities is to be decided by such board.

When the company was dissolved the reserve fund was not left to be disposed of under the rules to be applied by law to the distribution of the assets of insolvent corporations free from the provisions already spoken of.

The implication from the language used in the constitution and in the certificates is plain and forms part of the contract, and must be respected when the reserve fund comes to be distributed.

The case of *O'Brien* v. *Home Benefit Society of New York* (117 N. Y. 310) sheds no light upon this part of the

case.  That case arose against a living solvent company, and the action was at law to recover upon a certificate of membership issued to plaintiff's intestate.  The company had refused to pay on the ground of fraud, and had refused to make any assessment upon its members for the purpose of paying the certificate, or any part thereof.  The defendant claimed that if the plaintiff were entitled to maintain any action it was one in equity to compel an assessment.  We held an action at law was proper, and in that action it could be shown the amount which would have been collected by the assessment, and such amount was the damage sustained by the failure to levy such assessment up to the amount of the certificate.  It was shown the latter was for $2,000, and that the assessment would have realized at least double that sum, and the damage sustained was, therefore, $2,000.  In such a case it was said the defendant, when it refused to make an assessment, violated its contract and became liable to the plaintiff for the damages, and such damages were proved.  In this case, if we assume that the holder of one of these death claims became a creditor of the association, we do not think such fact enables him to resort to the reserve fund for payment.  He may be styled a creditor, but the contract which his intestate entered into was such as to preclude him from resorting to anything but the death fund for the payment of his claim.  To the same effect as the *O'Brien* case is *Darrow* v. *Family Fund Society* (116 N. Y. 537).

We think very little light is shed upon such a question by reference to cases arising in regard to dissolved insurance companies of a totally different kind from these co-operative or assessment concerns.  What damage is sustained by the failure of an ordinary insurance company with reference to its policy holders, what is the exact nature of its contract with them, and by what method it shall be discharged, are questions which have been heretofore determined with reference to the peculiar nature of such policies and of such companies.  In regard to co-operative companies a totally different plan of insurance has been adopted.  There is no regular premium paid in these companies, and it is impossible to tell what the cost of insur-

ance in a like company would be. And then, too, it is difficult to say what is a *like* company. The constitutions and agreements of these societies may, under the act of 1883, as amended by the act of 1887, be almost infinite in their variety. The provision for the distribution of the assets of the dissolved corporation " among its members, certificate holders, policy holders and creditors," as contained in section 13, as amended in the act of 1887, does not, in our judgment, at all affect the question as to the rights of the different classes of claimants in the different funds. Those rights must still be looked for in the contract made between the company and the holders of the certificates.

The case of *Burdon* v. *Mass. Safety Fund Assn.* (147 Mass. 360) is a case very much in point, as it arose in regard to a company or society of the same general nature as the one herein. We come to the same conclusion as did the learned court in that case. The difference of language in the two contracts is not sufficient to call for a different construction thereof.

*Second.* A question arises as to what holders of certificates shall share in the reserve fund.

Thirty-four assessments for the payment of claims had been made by the officers of the company in conformity with the constitution, and before the attorney-general instituted any legal proceedings against the company. Certain certificate holders had paid such assessments. After the thirty-fourth had been made and prior to the time appointed for the thirty-fifth assessment, the attorney-general commenced these proceedings, under the 13th section of the act of 1883, as amended by the act of 1887, for the purpose of procuring the dissolution of the company. A temporary receiver was appointed, and, pending the trial of the allegations in the petition of the attorney-general, upon which he asked for the dissolution of the company, the court, at his instance, enjoined the corporation, its trustees, directors, managers and other officers from collecting any debt or demand, and from paying out, or in any way transferring or delivering to any person, any moneys,

etc., of the company. In substance and effect, the order brought the business of the company to a standstill. The ground for demanding its dissolution, as alleged by the attorney-general, was that the company was conducting its business fraudulently. The application was based upon an official report of the facts made to him by the superintendent of the insurance department, and the report of that official was by the statute to be based upon an investigation which he was empowered to make, and such report was only to be sent to the attorney-general after an investigation by the superintendent, and after he was satisfied therefrom that the facts existed upon which the action of the attorney-general was demanded. The attorney-general was only directed to proceed against the corporation after the receipt of the report from the superintendent, if he should be of the opinion that the facts required such action. It is entirely apparent from this reference to the statute that when the attorney-general took the proceedings against the company, and alleged in his petition that it was conducting its business fraudulently, such allegation was not the result of any mere guess or surmise, but it was based upon the official report from a responsible public officer, made after an official investigation by him, conducted by virtue of the power given him by statute. A legal proceeding of this nature, commenced under such circumstances, would, in the nature of things, have a most harmful effect upon the company, and would almost, in and of itself, prevent the doing of any more business by the company.

In truth, although the officers of the company traversed the allegations of the law officer of the state, yet in the course of less than two months from the institution of the proceedings, the company withdrew its answer and permitted judgment of dissolution to go by default. The temporary receiver was appointed on the eighteenth of September. By the terms of the constitution already referred to, a bi-monthly assessment would be levied by the trustees on the eighth of October following, if the company were then in their hands. They, however, were stayed by the injunction which prohibited them from

collecting any debt or demand, and the proceedings for the dissolution of the company were in progress on the seventh of October. Upon petition of the receiver the court on that day ordered the officers of the association to make the mortuary assessment upon the members of the company in the manner and at the time provided for in the constitution and by-laws, including the assessment for the coming eighth of October. Acting under this order of the court the so-called 35th assessment (October eighth) was made, and a certain proportion only of the holders of certificates who had paid the 34th assessment, paid the 35th and last.

Those who paid this 35th assessment now claim the right to share in the reserve fund to the exclusion of all others, on the ground that such fund should, by the terms of the constitution, be paid only to those who paid all assessments and were living at the date when the fund was to be divided.

We do not assent to this claim.

We agree that no mere suspicion of insolvency justifies a policy holder in refusing to pay his premium when it becomes due. Very likely the same rule would obtain in the case of a certificate holder with regard to the payment of an assessment. In this case, however, the company was in the hands of a receiver and proceedings were on foot looking to a dissolution of the corporation on account of the fraudulent conduct of its business managers. These proceedings were based upon an official report of a public officer, and the presumption of its truth was not an unjustifiable one. Under such circumstances we are quite clear in the opinion there was no absolute and legal duty resting upon the certificate holders then existing, to pay this 35th assessment or else to lose all benefit to be derived from this reserve fund. We have no doubt that if the proceedings instituted by the attorney-general had terminated favorably to the company, the court would in that event have had the power to make some equitable provision for the case of those who had not paid assessments during the continuance of such proceedings.

The assessments provided for in the constitution were those

which were to be made by the officers of the company acting
under its constitution and by-laws, and not acting simply under
the direction of the court.  In this case the court in effect
made the assessment.  The payment of an assessment under
the scheme revealed by the constitution of the company, would
be founded upon the expectation that the company was to go
on as a business enterprise and continually seek and obtain
new lives in place of those who died, and from such new lives
obtain a portion of the means of payment of losses and a pro-
portionate security for the payment of future liabilities.  The
commencement of these legal proceedings was well calculated,
not only to shatter all hopes of securing new business, but also
to cause many holders to believe in the foolishness of paying
any more money with the sole result of thereby increasing an
already certain loss.  Upon this branch of the subject I think
the opinion of Judge BLODGETT in *Protection Life Insurance
Co.* (9 Bissell [U. S.] 188 at 196), is entirely sound.  The result
is that those certificate holders, who in fact paid the 35th
assessment, are not to share exclusively in this fund, but they
are entitled to have the amount of such assessment repaid to
them in full, and then all who paid the 34th assessment and
were living when these proceedings were commenced, shall
share in the reserve fund.  This payment must come from the
death and reserve funds in the proportion which each received
of such 35th assessment.

*Third.*  From what has already been decided it naturally
follows that those who are entitled to the reserve fund should
be paid therefrom *pro rata* according to the amount which
each has contributed thereto.  The fund belongs to them and
they are not restricted to the amount for which they might
purchase other insurance of the same nature in a similar com-
pany.  This is not the effect of their contract.  By its terms
they, as living certificate holders, are entitled to all there may be
of the fund, and the distribution is not to be made upon the
same lines as provided in the case of an insurance company,
such as the Security Life, where entirely different questions
arose.  (*People* v. *Security Life*, 78 N. Y. 115.)

*Fourth.* The date upon which to determine the rights of claimants upon the reserve fund should be the date of the commencement of the proceedings which terminated in the dissolution of the company.

In *Attorney-General* v. *North Am. Life Ins. Co.* (82 N. Y. 172, at 186), it was held that the date of the appointment of the receiver under the act of 1869, was the proper one at which to value all claims against the company, although it was not in fact dissolved until another application at a later date and under a different act. The court said the company was practically, although not technically, dissolved upon the first appointment of the receiver. There was under the act of 1869 a method by which the company should continue in a certain way to do business if the referee appointed under that act should so report, but the company did not continue and, therefore, the date named was adjudged the proper one. In this case the proceeding had for its end the dissolution of the company. We hold that after the commencement of the proceedings no assessments need be levied or paid, and if the proceedings terminate in dissolution, the status of the claimants at the commencement of the proceedings is the proper one upon which to base the distribution. If not dissolved, other considerations obtain which the court in such case would give the proper weight to.

If the company be dissolved and the date of its dissolution be taken as the proper time to adjudge the status of claimants, it seems to us great injustice is perpetrated. By failing to pay assessments otherwise falling due subsequent to the commencement of the proceedings to obtain a dissolution (which failure we hold to be proper), the death fund is not in the least augmented over its amount at the time of such commencement, while the number of persons who can claim to share therein is increased by each death up to the time of dissolution, and no assessment is made to pay it. The party thus dying loses all right in the reserve fund, while the death fund is not increased by the levy of any assessment to pay the death loss, and the dividend to each holder of a death claim is made constantly

smaller by the death of each certificate holder. The certificate holder on the contrary who lives until the date of distribution has been constantly having his share in the reserve fund increased by the death of any holder before such dissolution and he has been and is called upon to pay no assessment towards the liquidation of the death loss from the death fund. Injustice each way is the result. In holding that the assessments may be withheld subsequent to the commencement of legal proceedings and pending their continuance, the date of the commencement of such proceedings is the equitable one upon which to define the status of claimants resulting from a decree dissolving the corporation. The certificate holders at the time of the commencement of the proceedings must share in the reserve fund, and if any have died since that date their representatives are entitled to the share which would have come to them if living.

*Fifth.* The holders of death claims must also have their status defined as of the date of the commencement of the proceedings, which date is the same, I believe, as the appointment of the temporary receiver. Those certificate holders who died after that date have no claims upon the death fund, but their representatives share in the reserve fund as already stated.

*Sixth.* A preference among the death claims is demanded by the beneficiary under the certificate issued on the life of Johanna Hurley. She died on the 23d of April, 1889, proofs of death were filed with the company on the third of June, and on the eighth of August an assessment was made which raised over $13,000, seventy per cent of which went to the death fund. The constitution (Art. 6, § 1) provided for payment of death claims within three months after satisfactory proof of death and the approval thereof by the executive committee. Before that time arrived the temporary receiver had been appointed and all that had been collected of the assessment made in August after the payment of certain death claims therefrom, together with the other funds of the company, passed into his hands. The August assessment was known as the 34th, and was the last one made by the company. Prior

to the 33d assessment all assessments had been made at irregular times as deaths occurred and for the purpose of paying the particular death for which the assessment was made. The constitution was however amended prior to the 33d assessment, and by the terms of that amendment assessments were directed to be made bi-monthly, and the 33d and 34th assessments were made under such amendment, without reference to the death claims existing when the assessments were made, and for amounts equal to the full amount for which it was possible, under the constitution, to levy an assessment.

Prior to the levying of the August or 34th assessment, the claim of Hurley for $2,000 had been approved by the executive committee, as were also the claims of Creighton, $2,000 ; Cronin, $1,000 ; Day, $5,000, making a total of approved claims of $10,000, subsequent to the 33d and prior to the 34th assessment. There may have been other claims arising between these assessments, which had not received the approval of the executive committee. If the fund thus raised from the 34th assessment had been solely applicable to the payment of the above-named certificates, there was enough in the fund to pay the Hurley claim in full. The Creighton and Day claims were paid in full before the company went into the receiver's hands. The other claims were not paid.

The fund arising from the 34th assessment having passed into the hands of the receiver in less than three months after the approval of the executive committee, and, therefore, before the Hurley claim became due, he contested the claim, but was finally defeated and the claim established as valid. There were other death claims outstanding and unpaid at the time of the 34th assessment, and they have been proved before the referee. Upon these facts, we do not think the holder of the Hurley claim is entitled to payment in full before other claimants are paid anything. The 33d and 34th assessments were both levied under the amended constitution, by which an assessment was not levied for the payment of any particular death claim, and in fact the highest assessment that could be was made by the trustees for both of such assessments. The

mere fact that the Hurley claim was approved by the executive committee before the assessment was made, does not, in the light of the rule adopted for an assessment, give such claim a preference. The fund raised became a trust fund for the payment of all valid death claims, and those who held such claims at the time of the commencement of the legal proceedings are entitled to share *pro rata* in the fund existing for their payment. The change in the constitution and the mode of doing business show that it was not intended, nor indeed deemed practicable, to confine each assessment strictly to the payment of death claims happening since the last assessment. By the books that were kept, it would appear that certain amounts were realized from each assessment, and the date of a death loss would also appear, but when paid there would appear to have been no charge of the payment to any particular assessment.

There was but one fund kept as a death fund, and from its total, payments were made upon the different death claims as they came along at the end of disputes as to their validity or of compromises as to their amounts.

No preference over other death claims should be given to that of Hurley.

*Seventh.* The two funds should pay *pro rata* the expenses of the winding up. The commissions of the receiver must, of course, be founded upon the amount of each fund, and the percentage due must be paid by each.

We have, we think, now reviewed all the questions which have been presented for our determination, and the result is that the orders both of the General and Special Terms will be modified in accordance with the views herein expressed. The costs of the receiver only will be paid out of the two funds *pro rata.*

All concur.

Ordered accordingly.