### PEOPLE v. LUMBERT.

(Supreme Court, Appellate Division, Fourth Department. December 29, 1911.)

LARCENY (§ 68*)—OFFICERS OF CORPORATIONS—MISAPPROPRIATION OF CORPORATE FUNDS—BY-LAWS.

　　Where a benefit association maintained prior to Laws 1892, c. 690, § 205, requiring such associations to maintain a reserve fund for the benefit of its members or beneficiaries, a reserve fund pursuant to a by-law providing for the accumulation of a fund subject to the right to use the same for payment of any legal indebtedness of the association, and after the adoption of the law of 1892 it adopted by-laws relating to a reserve fund and declaring that the same should be the sole property of the policy holders of the association, subject to the right to use the same to pay any legitimate indebtedness against the association, an officer of the association who used the fund in payment of a valid indebtedness due from the association for money loaned to it, was not as a matter of law guilty of larceny, though the superintendent of insurance had not been aware of the provisions in the by-laws, and though he might have been deceived by the report made to him.

　　[Ed. Note.—For other cases, see Larceny, Dec. Dig. § 68.*]

Appeal from Onondaga County Court.

Orrin L. Lumbert was convicted of larceny, and, from a judgment of conviction and from an order denying a new trial, he appeals. Reversed and remanded.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Frank Hopkins, for appellant.
George H. Bond, Dist. Atty., for the People.

KRUSE, J. The defendant was indicted by the grand jury of Onondaga county, October 27, 1896, charged with the crime of

larceny in the first degree, committed on the 28th day of May, 1896, at the city of Syracuse in that county, in misappropriating the sum of $3,000 then in his custody and control, belonging to the Industrial Benefit Association, of which he was then president, and feloniously appropriated, so it is charged, to the use of himself and one M. E. Galvin and under such circumstances as to constitute stealing. The indictment also contains a count for larceny in the first degree at common law.

Defendant was tried and a verdict of guilty as charged in the indictment was rendered. A motion for a new trial was made and denied, and on January 4, 1898, he was sentenced to a term of imprisonment, and on the same day a notice of appeal was filed. A certificate of reasonable doubt seems to have been granted, but nothing further done until the present district attorney brought the appeal to the attention of this court and asked to have it disposed of. The case does not seem to be complete, although it appears that the record contains correct copies of the indictment, evidence, exhibits (except such as cannot be found), and the judgment roll, orders, notice of appeal, and case on appeal.

It is contended on behalf of the appellant that, upon the undisputed evidence, he was not shown guilty of the crime of larceny, and that prejudicial errors were committed on the trial.

That the money belonged to the Industrial Benefit Association is not in dispute, and I think the evidence establishes the fact that the money was paid out by the defendant or by his procurement, upon a valid claim owing by the association. The ground upon which the charge of larceny is founded is that the $3,000 was taken from a fund which could not properly be used for that purpose, as will more fully appear later.

The Industrial Benefit Association was a domestic, mutual benefit insurance company. It commenced business in 1885, with its principal office in Brooklyn. In 1889 the defendant was elected its secretary, and its principal office was moved to Syracuse. He was made its manager and a contract entered into between him and the association practically committing to him the entire management of it to January 1, 1900. It is unnecessary to follow in detail the business career of the association and the connection of the defendant with it. It is sufficient to call attention to the transactions which it is contended constituted the offense charged and the immediate surrounding circumstances.

It appears that the defendant and others associated with him advanced from time to time about $20,000 to the association to carry on its business, of which something over $4,000 was furnished by Galvin, mentioned in the indictment. In 1890 and 1891 the board of directors of the association by resolutions recognized and admitted the liability of the association for the moneys so advanced and directed the payment thereof out of the reserve fund of the association "as now provided in the by-laws thereof, in installments from time to time, as rapidly as the balance standing to the credit of said reserve fund will permit with interest thereon from the date of such advances

to the date of payment." While the resolutions recognized Lumbert as its sole creditor for these advancements and directed payment to him or his assigns and legal representatives, it appears that he assigned such part thereof as represented the amount advanced by the others associated with him, respectively, $4,749.63 of which was assigned to Galvin. $3,000 was paid to Galvin as payment in full of his claim, and ultimately came out of the reserve fund, as will be more fully explained, and upon this is founded the criminal charge made against the defendant.

The original by-laws, adopted in 1889, and apparently in force up to May, 1893, as well as the amendments adopted in May, 1893, are missing, although they were received in evidence and to some extent the record shows the provisions relevant to the questions here.

The transactions relating to the payment of the $3,000 are as follows: On May 28, 1896, a check was drawn upon the Third National Bank of Syracuse, whose cashier was then the treasurer of the association, payable to the order of M. E. Galvin, for $3,000, signed by the president and secretary of the association and countersigned by its treasurer; the defendant then being the president. This check recited upon its face that it was in full payment of Galvin's claim against the association. It was payable in New York exchange and delivered to Galvin at Syracuse. He deposited the check to his credit in a Detroit bank. It came through in the regular course of business and was paid by the Third National Bank, June 2, 1896. At that time the account of the association was apparently good. But it seems that the reserve fund account had not been transferred from the First National Bank to the Third National Bank, although the general account had been transferred in March, 1896. A check had been drawn upon the reserve fund account amounting to $12,867.18, to the Third National Bank on May 29th, and credited by the bank to the account of the association; but the First National Bank had refused to honor it, and it came back unpaid after the Third National Bank had paid the Galvin check, thus making an overdraft. However, the account was finally transferred to the Third National Bank, and thereupon and on June 6, 1896, the same officers who had drawn the Galvin check made an order directed to the Third National Bank to pay or transfer to the regular account $3,000, to pay the Galvin check, or rather the overdraft which had been caused by the payment of that check.

By the insurance law of 1892, corporations such as this association were required to accumulate and maintain a reserve or emergency fund, of an amount not less than the proceeds of one death or disability assessment on all its certificate or policy holders and at least equal to the amount of its maximum certificate or policy, and hold the same "for the benefit or protection of its members, their legal representatives or beneficiaries." The act provided for keeping the fund intact up to the required amount and for replenishing it in case of its use. The fund might be held in cash or invested in securities of the kind therein described. Laws 1892, c. 690, § 205.

. After the act took effect, the directors took steps to comply with

this provision, although a reserve fund had theretofore been provided for by the by-laws of the association. On April 1, 1893, the board met and called a special meeting of the association for the purpose of amending the by-laws, and accordingly a meeting was held May 12, 1893, and the by-laws amended. The by-laws were offered and received in evidence, but the exhibit is not contained in the record; the book having been lost. The by-law relating to the reserve or emergency fund, as it existed in 1894, is however set forth in the record, and I think it reasonably clear that, as regards the provisions to which I will now call attention, it was the same as the original by-law and was not changed by the amendments of May, 1893. That by-law provided how the emergency fund was to be accumulated, invested, and used, and, as therein stated, "shall be the sole property of the policy holders of the association," and used only as therein provided. But it was expressly provided therein that:

"Said sums may be used to pay any legitimate indebtedness against the association including the cost of investigating and contesting fraudulent death claims."

That this provision was a part of the by-laws before the meeting of May, 1893, and was not changed by any amendment, is apparent from the charge to the jury. It would therefore seem that, according to the express provisions of the by-law, the fund could be used to pay the claim in question, if it was a legitimate indebtedness of the association; and that brings us to the consideration of the two principal questions presented by this appeal: (1) Whether the Galvin claim was proven to be a legitimate claim against the association, and (2) whether the moneys in the reserve or emergency fund could rightfully be used to pay the claim.

1. The judge was requested to charge the jury that the $3,000 was paid upon a legitimate indebtedness of the Industrial Benefit Association. He declined to charge that, but left it as a question of fact for the jury, stating that the indebtedness of the defendant had been recognized by several meetings of the board of directors, and that Galvin had testified that the debt was due. The defendant excepted.

I think the undisputed evidence shows that these moneys had been advanced by the defendant and his associates and were owing by the association, and that the $3,000 was paid upon a valid claim against the association. Not only was the indebtedness recognized by the board of directors by formal resolution, but it was testified to by several witnesses, among others the treasurer of the association, who stated positively that he knew of the indebtedness and knew that the defendant had advanced the money; that some of it was advanced by other parties than defendant, but he was unable to say who, amounting in the aggregate to $20,000. I have searched the record in vain to find any evidence to the contrary. It is a matter of no consequence whether Galvin advanced the money directly to the association or through the defendant; and, besides, the defendant had made a formal assignment to Galvin.

2. As regards the use of the fund, the judge charged, as requested by defendant's counsel, that the by-laws of the association as amended

in 1893, provided that the reserve or emergency fund should be used first to pay legitimate indebtedness of the association, but held and charged as a matter of law that no by-law of the association or resolution would protect the defendant in paying the Galvin claim from the emergency fund, because such a by-law or resolution would be in contravention of the statute; although he permitted the by-law to be considered upon the question of felonious intent.

He also refused to charge, as requested by defendant's counsel, that the provisions of the insurance law were for the benefit of the members of the association and could be waived by the members; stating that although the adoption by the members of the association of the by-law providing for the use of the reserve or emergency fund referred to in the by-law, to pay legitimate indebtedness of the association, might have estopped the members from questioning a payment so made, it was not applicable to the case. Exceptions were duly taken to the charge, as made and to the refusal to charge as requested.

If the provision of the by-law to which I have adverted was in force at the time this fund was created and the $3,000 paid out on the Galvin claim, I think it could not be held as a matter of law that the by-law affords no protection to the defendant in paying the claim out of the fund. Assuming that the reserve or emergency fund created and held under section 205 of the insurance law is held in trust and to meet the claims of policy holders only, and cannot be used to pay the general debts of the association or their payment enforced out of the fund, I think it may well be found from the circumstances of this case that the fund here, by whatever name known or called, was a fund the disposition of which was controlled by the by-laws. Calling it a reserve or emergency fund did not make it such within the contemplation of the statute. The superintendent of insurance may not have been aware of this provision in the by-laws, and he may have been deceived by the reports which were made to him. But that is not controlling here upon the question as to whether the defendant committed larceny in using the fund as he did. As has been seen, the question of amending these by-laws was presented to the members, and the provision under consideration was left unchanged. It is not improbable that it was done deliberately, for at that time the association owed this sum of about $20,000, which had been used in its business, and payment had been directed out of the reserve fund. The association was subject to the visitation and inspection of the superintendent of insurance, and he had full power to investigate the doings and condition of the association, and could compel the association to accumulate a reserve or emergency fund for the purpose and as is provided by the insurance law. But, if this fund was not of that description, it could not be made so, simply by what the defendant said or reported or believed. We are not now dealing merely with the disposition of the fund as among different classes of creditors of the association (which may involve equitable and other considerations not apparent or involved here), but with the question whether the defendant should be held criminally liable upon a charge of larceny in paying a just claim against the associa-

132 N.Y.S.—68

tion out of this fund, when an express provision of the by-laws permitted that to be done.

It is possible that there are other circumstances, not disclosed by the record, which may have an important bearing on the questions in this case. The provisions of the policies or certificates are not before us, and the only complete set of by-laws of the association contained in the record are those in effect January 15, 1896, about six months before the business career of the association was ended and the receiver appointed. According to those by-laws, there were three funds: The mortuary, the emergency, and the expense fund. It was provided that the death claims should be paid out of the mortuary fund, that the expense fund should consist of such portion of the income from premiums as was necessary to conduct the business and consist of all that part of the income not set apart for the mortuary and emergency funds, and that the emergency fund should consist of all that portion of the income not set apart for the mortuary and expense funds, to be used: First, to pay *any* legitimate indebtedness against the association (as has already been pointed out); second, to replenish the mortuary fund whenever that was insufficient to pay existing approved claims; and, third, that after the mortuary fund had reached the sum of $100,000 in each class, the accumulations should be used in payment or reduction of premiums upon certain policies therein described.

In Matter of Equitable Reserve Fund Life Association, 131 N. Y. 354, 30 N. E. 114, where there was a controversy over certain funds of a dissolved corporation like this, it was held that the rights of the parties must be determined by the constitution, by-laws, and contents of the certificates issued by the association, all of which formed the contract between the company and the certificate holders.

Upon the record before us, I do not see how it can be held as a matter of law that this by-law did not apply to the fund in question and that it afforded no protection to the defendant in paying the claim out of it.

There are other points urged as grounds for reversal, but they are of minor importance and need not be discussed.

I think the judgment and order should be reversed, and a new trial ordered. All concur.