THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE ATTORNEY-GENERAL *v.* THE LIFE AND RESERVE ASSOCIATION of Buffalo, New York.

ELLA ROYCE, FRANK SPOONER and ELLEN DWYER, Death Claimants, Appellants and Respondents; HERMAN WATERMAN, Receiver, Respondent and Appellant; JOHN P. RILEY, a Death Claimant, Respondent.

1. ASSESSMENT LIFE INSURANCE — DISTRIBUTION OF FUND ON DISSOLUTION OF ASSOCIATION. When the certificates of membership in an assessment life and casualty insurance association, organized under chapter 175, Laws of 1883, under which parties claim an interest in the fund arising on the dissolution of the association in an action by the attorney-general, provide that the constitution and by-laws of the association shall form a part of the contract, it follows that, in determining the proper disposition of the fund, the liability of the association, and the rights of the parties, reference must be had to the provisions of the certificates, and to the constitution and by-laws as they existed at the time of the commencement of the action for dissolution.

2. CONSTITUENTS OF THE CONTRACT — DATE OF ADJUSTMENT OF RIGHTS AND LIABILITIES. Taken together, the provisions of such certificates and those of the constitution and by-laws, as they existed at the time of the commencement of the action for the dissolution of the association, constitute the contract between the parties and the standard by which their rights and liabilities are to be determined, and they are to be adjusted as of the date of the commencement of the action.

3. RESERVE FUND — LAWS OF 1883, CHAP. 175, § 21. The provision in the statute for the incorporation and regulation of co-operative or assessment life and casualty insurance associations (Laws of 1883, chap. 175, § 21) which authorizes the creation of a " reserve fund," to be used for the

payment of "death losses," is not to be construed so as to permit such associations to accumulate a reserve fund wholly from the contributions of one class of members and then devote it to the payment of death losses of another class who in no way contributed to it.

4. "Life" and "Life Reserve" Certificates — Reserve Fund and Death Fund — Construction of Constitution of Association — Transfers from Reserve Fund Limited to Payment of Claims under Reserve Certificates. Where, in accordance with its constitution, an assessment life insurance association, organized under the act of 1883, has issued two distinct and different kinds of certificates, one a "life" certificate, the other a "life reserve" certificate, and has required "life reserve" members to pay larger assessments than "life" members, and the constitution provides that the extra assessments paid by "life reserve" members shall be held as a reserve fund, and declares that "no person holding a life certificate shall be entitled to or shall in any manner derive any benefit from the reserve fund, but such fund shall be and is for persons holding life reserve certificates only," and the "life" certificates contain no reference to the reserve fund — a provision in the constitution for the creation and maintenance of a "death fund," to be held in trust for the benefit of policy or certificate holders for the purpose of paying death claims, and stating that there should be accumulated in the "death fund" a permanent sum from surplus of death assessments "or from transferring from the reserve fund not less than the proceeds of one death assessment of the maximum death claim," must be construed as intending a transfer from the reserve fund to the death fund only for the purpose of paying death claims arising under "reserve" certificates; and such provision does not authorize the application of any portion of the reserve fund, on the dissolution of the association by an action brought by the attorney-general, to the payment of death claims under mere "life" certificates.

5. Dissolution of Association — Reserve Fund — Dedication to Payment of Death Losses — Preference of Claims for Death Prior to Commencement of Action. Where the constitution of an insolvent assessment life insurance association dedicates the reserve fund to the payment of reserve certificates to the maximum limit upon death of the member, the holders of death claims under such certificates of members who died before the commencement of an action for the dissolution of the association are entitled, on such dissolution, to have such portion of the reserve fund as is necessary for that purpose appropriated to payment of their claims in full — the remainder of the fund to be distributed *pro rata* among the holders of reserve certificates.

6. Interest-bearing Bonds Issued to Holders of Reserve Certificates — Dissolution of Association before Bonds Become Available. Where the constitution of an assessment life insurance association provides for the issuance of interest-bearing bonds to the holders of reserve certificates, to be available for the payment of future

dues and assessments after a specified period, and that, in case the certificate on which such bonds are issued shall cease by death, the principal and interest of the bonds, available to pay assessments and not so used, shall be paid to the beneficiary, in addition to the amount of the certificate — *it seems*, that in case the period at which the bonds were to become available has not elapsed at the dissolution of the association, the beneficiary of a death claim holding such bonds is not entitled to payment on the bonds.

7. Trust for Payment of a Particular Claim Not Impressed upon Proceeds of Assessment.   The contention that the fund arising from an assessment made by a life insurance association immediately before the commencement of an action for its dissolution on the ground of insolvency, is impressed with a trust for the payment of a death claim under a particular life certificate, cannot prevail on an application to obtain payment of such claim from the receiver of the association, where the record shows that no portion of the money collected by the assessment reached the hands of the receiver, and there is nothing in the constitution or by-laws of the association or in the certificate appropriating money collected by an assessment to the payment of any particular claim.

*People ex rel. Atty.-General* v. *L. & R. Assn., Buffalo,* 92 Hun 592, reversed.

(Argued June 9, 1896; decided October 6, 1896.)

Cross-appeals from order of the General Term of the Supreme Court in the fifth judicial department, made December 26, 1895, which modified and, as modified, affirmed orders of the Special Term.

The Buffalo Mutual Life and Reserve Association was incorporated in February, 1883, under the provisions of chapter 267 of the Laws of 1875. It commenced and continued business under the provisions of that statute until February, 1886, when it was re-organized under chapter 175 of the Laws of 1883, as The Life and Reserve Association of Buffalo, New York.

Under the latter name it continued business until the twenty-third day of September, 1892, when this action was commenced. A judgment dissolving the association was entered therein on the twenty-seventh day of December, 1892. An order winding up its affairs and for the distribution of its assets to and among its members and other persons entitled thereto, was granted upon the same day. Herman Waterman

was duly appointed first as temporary receiver, and subsequently as permanent receiver of such corporation.

The order or judgment of dissolution also contained a provision appointing Honorable Henry F. Allen referee, to take proof of the condition of the affairs of the corporation, and to ascertain to whom the assets of the association should be paid. The assets of the company at the time of its dissolution amounted in the aggregate to $176,816.22, some portion of which was uncollectible. At the time of the dissolution, the members of the association holding certificates numbered forty-six hundred, of which thirty-six hundred were members of the reserve class and held life reserve certificates, and the members of the association holding life certificates numbered one thousand.

The general and outside indebtedness of the association amounted to about five thousand dollars. The death claims in the reserve class unpaid at the commencement of this action amounted to $23,450, while the death claims unpaid at that time based upon life certificates were $25,500. When the receiver took possession of the property of the corporation, it was ascertained that $32,833.94 of the reserve fund was not accounted for on the books of the association; that $3,906.05 had been lost in real estate investments, and that $36,000 of this fund had been used in paying death claims against the association, thus making a total of $72,739.99 of the reserve fund which had not been held exclusively for persons holding life reserve certificates. The assets on hand were not equal to the amount of the reserve fund which had been collected, and its accumulations. The death fund was overdrawn, and the safety fund had been exhausted. Substantially all the moneys on hand for distribution belonged to the reserve fund, and had been contributed by the reserve members of the association.

Before the commencement of this action, and in December, 1886, Gilmore D. Royce became a member of the association, and it issued to him a certificate for one thousand dollars in

13

the reserve class, making Ella Royce the beneficiary therein. Gilmore D. Royce died in February, 1892, while a member of the association in good standing. Thereafter, Ella Royce presented a claim against the association for the amount named in such certificate. It was submitted upon proper proofs to the referee, who disallowed it. To that determination she filed exceptions which were heard at a Special Term of the Supreme Court May 7, 1895. The court sustained the exceptions, held that the claimant had an equitable lien upon the reserve fund, and directed her claim, with interest, to be paid therefrom.

The appellant Frank Spooner is the beneficiary named in a certificate in the reserve class issued to his wife for one thousand dollars. She died August 23d, 1892, while a member in good standing. The matters affecting his claim are the same as those existing in the case of Ella Royce.

The appellant Ellen Dwyer is a beneficiary under a life certificate issued to John Dwyer, who died prior to the commencement of this action, and at the time of his death was a member in good standing. The amount of his certificate was two thousand dollars. The claim was disallowed by the referee, and the claimant thereupon filed exceptions to his report, which the Special Term overruled.

The Special Term in effect held: 1. That death claims arising on life certificates were not entitled to be paid out of the reserve fund; 2. That death claims arising upon life reserve certificates were entitled to be paid therefrom; 3. That after payment of the general debts existing at the time of its dissolution, the expenses of winding up its affairs, and the death claims existing against the association arising on life reserve certificates issued to members who died before the commencement of this action, the remainder of the reserve fund should be distributed to the living members of the life reserve class in good standing, and to the representatives of members of that class who have died since the commencement of this action, in the proportion which the amount contributed by each bears to the whole amount of the fund; and, 4. That

all moneys in the hands of the receiver derived from the assessments levied by the association in September, 1892, should be returned to such members respectively.

The court thereupon ordered that from the moneys in his hands the receiver pay and distribute to the claimants whose claims have been established the sum of $55,000 as follows: 1. That he pay each and all of the claims allowed for money paid the association by claimants which came to the hands of the receiver from the assessment of its members in September, 1892; 2. That out of the remainder he pay each and all claims of general creditors in full as established by the report of the referee; 3. That he reserve in his hands $28,249 for the payment of death claims upon life reserve certificates until the question whether they should be paid in full was finally determined; and 4. That the residue of the sum of $55,000 be paid to the executors, administrators or beneficiaries of members of the association whose claims as holders of life reserve certificates have been allowed.

From the order of the Special Term sustaining their exceptions and adjudging that Royce and Spooner have an equitable lien on the reserve fund of the association, and that their claims should be paid therefrom, the receiver appealed to the General Term, and Ellen Dwyer also appealed from the order of the Special Term overruling her exceptions to the report of the referee. By stipulation of all the parties, and with the consent of the court, these appeals were heard and determined by the General Term as one. The order of the Special Term was modified by the General Term, and that court directed that $10,000 of the reserve fund should be paid to and distributed among the holders of the death and disability claims of both classes which existed at the time of the commencement of this action, and that the residue of the reserve fund should be distributed to and among the members of the reserve class whether living or dead at the time of the commencement of this action, without any diminution by reason of having shared in said $10,000.

From so much of the order of the General Term as directed

that only $10,000 should be distributed among the holders of death claims, and that the remainder be distributed among the holders of life reserve certificates, the appellants Royce, Spooner and Dwyer appealed to this court. The receiver appealed to this court from that part of the order which directed that $10,000 with interest should be transferred from the reserve fund to the death fund, and held that it was properly applicable to the payment of the valid death and disability claims made against the association arising either upon life certificates or life reserve certificates.

The constitution and by-laws of the association, so far as material to the questions involved, are as follows:

" Object. The object of the Life and Reserve Association is to combine the efforts of all its members, with the view to furnish life indemnity of pecuniary benefits to the widows, orphans, heirs or relatives by consanguinity or affinity, devisees or legatees of deceased members, or permanent disability indemnity to members· thereof; and further, to collect and accumulate funds to be held in trust and to be used by the association and its members in reducing future dues and assessments, and for such other purposes as are hereinafter provided for under the constitution, by-laws and amendments thereto." (Art. 1, § 3.) The constitution then provides that in no case shall the amount of certificates exceed $10,000 for males and $5,000 for females. (Art. 2, § 2.)

Section 3, article 2, provides:

" CERTIFICATES.

" This association shall issue two kinds or forms of certificates, one of which shall be known as a Life Certificate and the other as a Life Reserve Certificate. No person holding a Life Certificate shall be entitled to or shall in any manner derive any benefit from the Reserve Fund, but such fund shall be and is for persons holding Life Reserve Certificates only." It then states when life certificates shall issue, when life reserve certificates 'may be issued, and the amount of assessments upon each, the life reserve certificate being assess-

1896.] People ex rel. Atty.-Gen. *v.* Life & R. Assn. 101

N. Y. Rep.] Statement of case.

able to twice the amount of the life certificates. It then declares; "After four years from the date of the Life Reserve Certificates and at the end of each period of four years thereafter, during the continuance of the certificates, commencing with the first day of January first preceding the date of such certificates, a bond will be issued (bearing interest) for the Reserve Fund, set apart according to Article 6; said bond and interest being available to pay future dues and assessments at such periods from their date as set forth in Article 6."

Section 3 of article 3, which relates to assessments, contains the following: "There shall be accumulated in the death fund a permanent sum from surplus of death assessments after the payment of claims assessed for or from transferring from the Reserve Fund, of not less than the proceeds of one death assessment of the maximum death claim, which shall be invested in such security as the laws of the State permit insurance companies to invest their capital in, or deposited to the credit of the Association in a Bank or Trust Company, and which, together with all interest and accretions thereto, shall be held in trust unimpaired, for the benefit of policy or certificate holders, for the purpose of paying death or disability claims only. Should this sum or any portion of it be withdrawn for the purpose of said trust, the same shall be replaced as originally constituted."

Section 5 of article 3, which is entitled "Death Fund" provides: "Whenever the Death Fund of the Association shall be insufficient to pay and satisfy the deaths occurring in any one year after having made twelve times the above assessment schedule (or collected a sum equal to that amount in six bi-monthly calls), or when the death rate of the Association exceeds the American Experience Tables of Mortality, if such an excess should ever occur or nine-tenths of one per cent, the Executive Committee may make good any deficiency in the Death Fund out of the Safety Fund, as provided by Section 12, Article III, of the By-Laws. There shall be nothing in this Constitution and By-Laws, however, that may be construed as

prohibiting the transfer of money from the Safety Fund to the Death Fund for the purpose of paying death claims on or before said Safety Fund shall exceed its limit."

### Art. IV, § 2.

" Death Claims. Payment of all death claims shall be made within ninety days from the date of the bi-monthly assessment first ensuing after the approval of the said claim."

### Art. IV, § 6.

" Payments of Certificates. When a death claim becomes due and payable, the maximum amount may be paid from the Death Fund as the certificates and the Constitution and By-Laws may prescribe, or such part thereof, as an assessment of once the schedule, at the time said death occurred, will pay the death fund."

Article six of the constitution is entitled " Reserve Fund," and, so far as it relates to the questions to be considered, reads :

" Sec. 1. How Created. All members holding Life Reserve Certificates will pay a reserve assessment, as shown by graded assessment table, Article 3, Section 4, of the Constitution, which net reserve assessment    *    *    *    will be set aside as a reserve fund, which, together with interest earnings of said fund, shall be securely invested in United States Bonds or mortgages on unincumbered real estate, or other first-class interest-bearing securities, in the name and by the direction of the Association.    *    *    *    This Reserve Fund, together with its earnings, is for the exclusive benefit and to reward the fidelity of the old and persistent members, and to make the Association sound and permanent, thereby guaranteeing the payment of every member's certificate at death, to the maximum limit named therein.

" § 2. Disposition of the Reserve Fund. A portion of the Reserve Fund mentioned in the preceding section will be set apart and an interest-bearing bond issued for same to members at the end of each period of four years. The principal of the first bond shall be available six years from its date, and

all other bonds four years from date, towards paying future
dues and assessments under the certificates on which said bonds
were issued.  The interest on all bonds shall be applicable, as
it accrues and becomes available, for the payment of assess-
ments; and should said certificate of membership, on which
said bonds were issued, cease by death, the amount of princi-
pal and interest of said bonds, which is available to pay assess-
ments and not thus used, shall be paid beneficiaries in addition
to the amount of certificates of membership; but should cer-
tificates of membership, under which said bonds were issued,
cease by failure of the member to keep up his dues or assess-
ments on said certificates, as provided for in the constitution,
any portion of the said principal or interest not thus used, or
any portion of the bonds at death not available to pay assess-
ment, shall be applied to increase the bonds issued at the next
quadrennial apportionment to members of the Association.

"§ 3. Contingent Liability and Absolute Surplus.  The
Association shall, on the first business day of January in each
year, beginning with the year 1887, set apart from the
Reserve Fund a sum, and cause the same to be divided among
the members who shall hold Life Reserve Certificates, and
who are at the time of four (4) and every multiple of four
(4) years' standing in the Association, and issue to them bonds
representing their proportion.  This sum shall be taken and
considered as a contingent liability upon the Association; the
amount to be set apart in any one year shall not in the aggre-
gate exceed a dividend of one hundred per cent of the
amount paid in assessments and dues during the four years by
members entitled to receive bonds, nor shall any individual
member be entitled to bonds exceeding in amount that which
has been paid by such member in total assessments and dues
during the four years.  The Reserve Fund which has not
been set apart, or for which no bonds have been issued, shall
be held by the Association as absolutely and strictly a Surplus
Fund, and no member of the Association shall have any
claim whatever upon this fund, and it shall be regarded in
equity and in law as a Surplus Fund."

The words, " and to make the Association sound and permanent, thereby guaranteeing the payment of every member's certificate at death, to the maximum limit named therein," were added to section one by amendment in 1888.

In article three of the by-laws of the association is the following : " § 12. SAFETY FUND.  The stability and permanence of the Association are further guarded, in order to prevent the possibility of its ever becoming unsound, by setting apart eighteen per cent of the net receipts from death assessments   *   *   *   together with the admission fees and dues received, into a fund to be known as the Safety Fund. The Board of Directors are hereby prohibited from using any money received for Death or Reserve Funds for the purpose of paying salaries or running expenses of the Association, except from Safety Fund, from which the actual expenses of the Association shall be paid ; such Safety Fund in excess of thirty thousand dollars shall be transferred to the Death Fund whenever the death rate of the Association exceeds the American Experience Tables of Mortality."

The certificates which were issued to reserve members provided that the association would pay from the death fund the amount of the certificate or, in case of total, permanent disability for life, half that amount.  It also contained this provision :  " The Death Fund of the Association is set apart from assessments, for the exclusive and sole purpose of paying claims by death or total disability.   *   *   *   The Reserve Fund shall be securely invested in United States bonds, mortgages on unincumbered real estate, or other first-class interest-bearing securities, for the exclusive benefit of members of the Association. At each period of four years of continuous membership of this Certificate, a Bond will be issued (bearing interest) for an equitable proportion of the Reserve Fund.   Interest on said bond may be used annually from its date toward paying future assessments, and the principal of said Bond, when available, toward paying future assessments under this certificate ; or in case of death, paid to the beneficiary, together with this Certificate of Membership ; thus the interest is available after

1896.] People ex rel. Atty.-Gen. *v.* Life & R. Assn. 105

N. Y. Rep.]                    Points of counsel.

four years and the principal after ten years to pay future
assessments. This certificate is issued and accepted subject
to all the provisions and stipulations contained in the Consti-
tution and By-Laws of this Association, which are hereby made
a part of this certificate, with any amendments that may here-
after be made thereto."

The certificate issued to life members was similar to that
issued to reserve members, and contained the provision :
" The Death Fund of the Association is set apart from
assessments, for the exclusive and sole purpose of paying
claims by death or total disability," but contained none of the
other provisions quoted. Nor did it in any way refer to the
reserve fund.

Upon the notice of assessment used by the association was
indorsed an explanation as to the reserve fund, in which it is
stated that the reserve fund with its earnings " is for the
exclusive benefit and to reward the fidelity of the old and
persistent members, and to make the association sound and
permanent, thereby guaranteeing the payment of every mem-
ber's certificate at death, to the maximum limit named
therein."

*William E. Prentice* for Royce, Spooner and Dwyer,
appellants and respondents. The intent, as found in the lan-
guage of the contract, must control in disposing of the reserve
fund. (*In re E. R. L. F. Assn.*, 131 N. Y. 355 ; *Bur-
don* v. *M. S. F. Assn.*, 147 Mass. 360.) These claimants have
an equitable lien upon the reserve fund for the payment of
their claims, and this court has jurisdiction in these proceed-
ings to enforce such lien and direct the payment of these
claims out of such fund. (Laws of 1883, chap. 175, § 21 ; 3
Pom. Eq. Juris. §§ 1235, 1237 ; *Husted* v. *Ingram*, 75 N. Y.
251 ; *Hale* v. *O. Nat. Bank*, 49 N. Y. 626 ; *Fowler* v. *M.
L. I. Co.*, 28 Hun, 198 ; *Brown* v. *Volkening*, 64 N. Y. 76 ;
*Willetts* v. *Reid*, 5 N. Y. St. R. 175 ; 42 Hun, 140 ; *M. C.
Co.* v. *Sperry*, 9 N. Y. St. R. 342 ; 120 N. Y. 620 ; *Vinch* v.
*Anthony*, 8 Allen, 536 ; *Dagett* v. *Rankin*, 31 Cal. 321–326 ;

14

·*Grinnell* v. *Suydam*, 3 Sandf. 132; Beach on Mod. Eq.
Juris. §§ 287, 331, 939, 945; Story's Eq. Juris. § 1251; *In re
E. R. F. L. Assn.*, 131 N. Y. 354.) The contract entered
into by the association with its members guaranteed the pay-
ment of death claims, and in the contract the reserve fund
was pledged to fulfill the guaranty. (2 Beach on Mod. Eq.
Juris. § 939; 132 N. Y. 540; *In re E. R. F. L. Assn.*, 131
N. Y. 354; *O'Brien* v. *H. B. Society*, 117 N. Y. 310.)
Death claimants are entitled to a fixed and definite sum men-
tioned in the certificates. In contracts of insurance, where
there is any ambiguity, and where the interpretation is diffi-
cult, we should adopt that construction which the insurer had
reason to suppose was understood by the insured. (*Wads-
worth* v. *J. & T. Co.*, 132 N. Y. 540; *Hoffman* v. *A. F. Ins.
Co.*, 32 N. Y. 405; Laws of 1887, chap. 285; *McMaster* v.
*Ins. Co., N. A.*, 55 N. Y. 222; *Kratzenstein* v. *W. A. Co.*,
116 N. Y. 54; *Dilleber* v. *H. L. Ins. Co.*, 69 N. Y. 264;
*Herrman* v. *M. Ins. Co.*, 81 N. Y. 188; *White* v. *Hoyt*, 73
N. Y. 505.) If there are conflicting rights, the language on
which death claimants depend is subsequent, special and
controlling. (*Parshall* v. *Eggert*, 54 N. Y. 18.) The
assets must be distributed as of the date of the com-
mencement of this action, viz., September 23, 1892.
(*McNally* v. *P. Ins. Co.*, 137 N. Y. 398; Niblack on Ben.
Soc. § 124.) A policy of life insurance is a contract to pay a
certain sum of money at a certain time after the death of the
insured, and it is proper to allow interest on this sum from
the time it becomes payable. (Niblack on Ben. Soc. 693,
§ 360; *K. Ins. Co.* v. *Gould*, 80 Ill. 388; *Supreme Lodge* v.
*Zuhlke*, 129 Ill. 398; *Supreme Council* v. *Franke*, 137 Ill.
118; *Heislet* v. *Stose*, 131 Ill. 393; *H. Ins. Co.* v. *Lewis*, 28
Fla. 209; *M. T. Ins. Co.* v. *Robinson*, 98 Ill. 324; *Perine*
v. *Grand Lodge*, 51 Minn. 225; *Newman* v. *C. M. Ins. Co.*,
76 Iowa, 56; *Stowell* v. *Am. Assn.*, 23 N. Y. S. R. 706.)
These death claimants are creditors of the association, and
their claims are debts. (*Vannatta* v. *N. J. M. L. Ins. Co.*,
31 N. J. Eq. 15; *Commonwealth* v. *M. M. Ins. Co.*, 112

Mass. 116; *A. Ins. Co.* v. *Swift*, 10 Cush. 433; *M. Ins. Co.* v. *Fuller*, 8 Allen, 274; *Sterling* v. *M. Ins. Co.*, 32 Penn. St. 75; *N. E. Ins. Co.* v. *Butler*, 34 Me. 451; Bacon on Ben. Soc. § 479.)

*John Cunneen* for receiver, respondent and appellant. The rights of the parties are to be determined by the constitution and by-laws in force at the commencement of this action. (*In re E. R. F. L. Assn.*, 131 N. Y. 354; *Burdon* v. *M. S. F. Assn.*, 147 Mass. 360.) The funds in hand belong to the surviving members of the reserve class and the representatives of those who have died. They are not applicable to the payment of death claims of either "life class" or "reserve class." (*In re E. R. F. L. Assn.*, 131 N. Y. 354; *People* v. *Life Union*, 83 Hun, 598; 145 N. Y. 606.)

*Hamilton Ward, Jr.*, for Riley, respondent. The Dwyer and Benson death claims, for the payment of which the July assessment was made, should be paid in full from the funds of the association in the hands of the receiver. (Niblack on Mut. Ben. Soc. § 147; *In re E. R. F. L. Assn.*, 131 N. Y. 380; *Darrow* v. *F. F. Society*, 116 N. Y. 541; *O'Brien* v. *H. B. Society*, 117 N. Y. 318; *Wadsworth* v. *J. & T. Co.*, 26 J. & S. 88; 132 N. Y. 540; *People* v. *City Bank of R.*, 96 N. Y. 37; *Cavin* v. *Gleason*, 105 N. Y. 256, 264; *Baker* v. *N. Y. N. E. Bank*, 100 N. Y. 30; *In re Le Blanc*, 14 Hun, 8; 75 N. Y. 598; *I. & T. N. Bank* v. *Peters*, 123 N. Y. 272; *Van Alen* v. *Am. Nat. Bank*, 52 N. Y. 1; *Dows* v. *Kidder*, 84 N. Y. 121.)

MARTIN, J. Several questions presented on the trial before the referee are not before us, as the parties have not appealed from the portion of the order which determined them.

The most important question we are called upon to decide is whether the General Term properly held that $10,000 of the reserve fund should be applied to the payment *pro rata* of death claims arising under both kinds of certificates where

108　People ex rel. Atty.-Gen. *v.* Life & R. Assn. [Oct.,

Opinion of the Court, per Martin, J.　　[Vol. 150.

the claim existed before the commencement of this action; that death claims under reserve certificates should not be paid in full, and that the remainder of the fund, after deducting $10,000, should be distributed among the holders of life reserve certificates.

As the certificates, under which the parties claim an interest in the fund, provide that the constitution and by-laws of the association shall form a part of the contract, it follows that, in determining the proper disposition of the fund, the liability of the association, and the rights of the parties, reference must be had to the provisions of the certificate, and to the constitution and by-laws as they existed at the time of the commencement of this action. Taken together, they constitute the contract between the parties and the standard by which their rights and liabilities are to be determined, and they are to be adjusted as of the date of the commencement of the action. *(Matter of E. R. F. L. Assn.,* 131 N. Y. 354, 369.)

Section 21 of chapter 175 of the Laws of 1883, as amended by section 6 of chapter 285 of the Laws of 1887, declares : " Nor shall anything in this act prevent the creation of a reserve fund by any corporation, association or society transacting the business of life or casualty insurance, or both, upon the co-operative or assessment plan, which funds or its accretions, or both, are to be used for the payment of assessments or death losses, or for benefits in case of physical disability only." It was under the provisions of this statute that the defendant was re-incorporated and its constitution and by-laws created. The portion of the statute quoted contains the only authority the association possessed to create a reserve fund, and states the purposes for which such a fund may be accumulated. It authorizes its creation for the payment of assessments or for the payment of death losses or disability benefits. Under the statute those are the only purposes to which such a fund could properly be devoted. In its constitution, the objects of the association, so far as they relate to the reserve fund, are stated to be to collect and accumulate a fund to be held in trust and

1896.]   People ex rel. Atty.-Gen. *v.* Life & R. Assn.   109

N. Y. Rep.]      Opinion of the Court, per Martin, J.

used by the association and its members in reducing future dues and assessments and for such other purposes as are thereinafter provided for by the constitution, by-laws and amendments thereto. Notwithstanding this general statement as to its purpose, it is manifest that while a fund thus accumulated might be devoted to the reduction of future dues and assessments, yet under the statute the association had no authority to devote it to any other purpose than that, except to pay death losses or disability benefits.

While the statute in its reference to death losses is general and unlimited, yet it could not have been the intention of the legislature to permit such associations to accumulate a reserve fund wholly from the contributions of one class of members and then devote it to the payment of death losses of another class who in no way contributed to it. To attribute to the legislature such an intent would be to impeach its integrity and fairness of purpose. We think the statute should not be construed so as to permit any such unjust and absurd result.

One of the questions presented is whether, under the statute and contract between the parties, losses arising by the death of persons holding life certificates can be properly paid from the reserve fund thus accumulated. Obviously, the reserve fund was intended to be used only for the benefit of those holding reserve certificates. To place that question beyond cavil or peradventure, the constitution expressly provides that no person holding a life certificate shall be entitled to, or shall in any manner derive, any benefit from the reserve fund, but such fund shall be and is for persons holding life reserve certificates only. No plainer, more definite or positive statement as to the members who were to be benefited by the accumulation of that fund could have been made. In the most decisive and emphatic language it is declared that the holders of life certificates shall derive no benefit from the reserve fund. Thus it not only awards to the holders of reserve certificates all benefits to be derived from it, but positively forbids life members participating therein.

110    People ex rel. Atty.-Gen. *v.* Life & R. Assn.  [Oct.,

Opinion of the Court, per Martin, J.          [Vol. 150.

Under the constitution the association was · authorized to issue two distinct and different kinds of certificates: One, a mere life certificate; the other, a life reserve certificate.  The difference between them is marked, and seems well nigh con- · trolling as to the rights of the holders of life certificates to share in the fund in the hands of the receiver.  This difference is that the amount paid by a life member is only one-half that required to be paid by a reserve member, and, in consideration of the payment of such increased assessments, the increase is to be held by the association as a reserve fund for the sole benefit of the reserve members.  Indeed, the dominant purpose of the contract was to provide for two kinds of certificates, and that the holders who paid increased assessments should alone share in the benefit of the reserve fund. Nothing can be plainer than this.  Therefore, while examining the other provisions of the contract, it is necessary that this purpose should be borne in mind.

Section three of article three of the constitution provides that there shall be accumulated in the death fund a permanent sum from the surplus of the death assessments, or from transferring from the reserve fund not less than the proceeds of one death assessment of the maximum death claim.  It was upon the latter provision that the learned General Term based its decision directing ten thousand dollars to be distributed among the holders of death claims.  If construed alone and entirely independent of the other provisions of the constitution, it may be that the effect given to that provision by the General Term would be proper.  The language is general, and, standing alone, sufficiently broad to sustain the contention that a portion of the reserve fund might be devoted to the payment of death losses even under life certificates.  But when read in connection with those provisions of the constitution, which in absolute and unqualified terms declare that no person holding a life certificate shall in any manner derive any benefit from the reserve fund, it becomes obvious that the conclusion of the General Term cannot be sustained.  When all the provisions relating to this subject are considered

together, it is clear that it was not the intent of the constitu-
tion to provide that any portion of the reserve fund should be
transferred to the death fund for the payment of death claims
which were expressly excluded from any participation in that
fund.  Its purpose doubtless was to provide, in an emergency or
case of necessity, for the transfer from the reserve fund to the
death fund of an amount necessary to pay death losses arising
under reserve certificates.  In other words, the provision for
transferring a portion of the reserve fund to the death fund must
be limited and governed by the other provisions of the con-
stitution.  When so limited it is plain that such transfer could
be made only for the purpose of paying death claims arising
under reserve certificates.  This construction renders all the
provisions of the contract harmonious, and carries out its
manifest spirit and purpose.  Any other construction would
be contrary to the evident intent of the statute, as well as to
the clear and positive terms of the constitution.

Moreover, as the reserve fund was created solely by the
contributions of reserve members, it would be highly unjust
and inequitable to distribute any portion of it among life
members.  Such a disposition of the fund would result in a
practical confiscation of the property of the reserve members.
Our conclusion is that the reserve fund was created for the
exclusive benefit of the holders of the reserve certificates, and
that the holders of life certificates were not entitled in any
way to share in its distribution.

This brings us to the consideration of the question, whether
such a portion of the reserve fund as is necessary for that pur-
pose should be appropriated to the payment of death claims
of members holding reserve certificates who died before the
commencement of this action, or whether the whole fund
should be distributed *pro rata* among all the holders of such
certificates.  If this fund was pledged or dedicated to the
purpose of assuring or guaranteeing payment of such certifi-
cates to the maximum limit upon the death of such a member,
then plainly the holders of such death claims are entitled to
resort to that fund for their payment.

Section one of article six of the constitution contains this provision : " This Reserve Fund, together with its earnings, is for the exclusive benefit and to reward the fidelity of the old and persistent members, and to make the Association sound and permanent, thereby guaranteeing the payment of every member's certificate at death, to the maximum limit named therein." In construing this provision, it must be remembered that it is contained in that portion of the constitution which relates only to the reserve fund, and, consequently, it must be regarded as referring solely to members interested therein. The provision guaranteeing the payment of every member's certificate was clearly intended to refer to reserve members only. No others could have been intended. If otherwise, that provision would have been in direct conflict with the other provisions of the constitution, which declare that no person holding a life certificate shall be entitled to or shall in any manner derive any benefit from such fund.

Here we have then a provision which, properly construed, provides that the reserve fund of the association with its earnings is for the exclusive benefit and to reward the old and persistent members holding reserve certificates by assuring or guaranteeing the payment of every such member's certificate to the maximum limit. This was a guaranty among contributors to the reserve fund, and as there was no other provision for the full payment of the amount of their certificates unless resort might be had, when necessary, to that fund, it was in effect a pledge of it for that purpose. The last clause of that provision was added by amendment in 1888, and its obvious intent was to bring the association within the provisions of the statute, which authorized the use of the reserve fund for the payment of death losses, and to provide that members who were entitled to share in it should receive the maximum amount of their certificates. Thus, by the terms of the constitution, the reserve members of the association dedicated that fund, so far as necessary, to the payment, at death, of every such member's certificate.

The receiver, however, persistently urges that the intent of

this provision was to insure the payment of the dues of the reserve members, and in that way only to guarantee the payment of death claims, but that it was not intended that any part of that fund should be applied to that purpose. If such was its only object, why was there any necessity to amend that section of the constitution? Before it was amended the reserve fund was as available to pay assessments as it was after. No change in that respect was made. The amendment must have been made to accomplish some purpose. Evidently it was not to insure the payment of dues and assessments, as that had already been provided for, and was not affected by the amendment. We think its purpose was to bring itself within the provisions of the statute, and to devote the reserve fund to the payment of death losses of reserve members so far at least as was necessary to secure their payment in full. If such was not its purpose, the amendment was meaningless and ineffective. We do not think the contention of the receiver can be sustained. We are of the opinion that such a portion of the reserve fund as is necessary should be appropriated to the payment of death claims of members holding reserve certificates who died before the commencement of this action, and that the remainder of the fund undistributed should be divided *pro rata* among the other holders of reserve certificates.

The case of *Burdon* v. *Mass. Safety Fund Assn.* (147 Mass. 360), cited with approval in *Matter of E. R. F. L. Assn.* (131 N. Y. 354, 374) is relied upon as sustaining a contrary doctrine. In the *Burdon* case, the only ground upon which it was claimed that the funds belonging to the insolvent corporation could be applied to the payment of death losses was, that upon the back of the certificates issued there was an unsigned statement to the effect that the association would provide material and substantial protection for the families or other dependents of deceased members, by means of a safety fund which combined an improved plan of co-operative protection with the safety fund deposit, thereby rendering all the members and their dependents perfectly safe at the lowest possible rate. In that case, without passing upon the question
15

114 People ex rel. Atty.-Gen. *v.* Life & R. Assn. [Oct.,

Opinion of the Court, per Martin, J.          [Vol. 150.

as to what would have been the effect if the notice had been a part of the contract, the court distinctly held that it was not, and hence was entitled to no consideration in determining the question before the court. There the safety fund provided for was to inure to the benefit of members of five years' standing, by having the income from it, after five years, or after the accumulation should have amounted to one hundred thousand dollars, applied to the payment of their future dues and assessments, and if the association should fail to pay the indemnity provided for in the certificate, then the safety fund was to be converted into money, and divided among all the holders of certificates then in force, and not to be drawn upon to make good the indemnity for a loss by death, and it contained an express stipulation that the fund mentioned should be in no wise chargeable or liable for any use or purpose except that mentioned. Under those circumstances, it was held that the fund must be devoted to the purpose specified in the contract, and could not be applied in payment of death losses.

That case is clearly distinguishable from the case under consideration, as in that case there was no pledge or dedication of the fund to the payment of such claim, while in this, as we have already seen, one of the purposes for which such a fund was created was to insure the payment of death losses where the member held a life reserve certificate.

So in the *Matter of E. R. F. L. Assn.* (131 N. Y. 354), where a reserve fund was created, and was to be deposited in trust for purposes specified, which were for the benefit of living members, it was held that upon a dissolution of the corporation death losses could not be paid from the reserve fund. The principle of that case is clearly right, and fully sustains our conclusion that death losses, where a deceased member held a life certificate only, could not be paid from such fund. But, in this case, there was an express provision in the constitution, which formed a part of the policy, which dedicated the reserve fund to the payment of losses where the member held a reserve certificate. The cases are, therefore, wholly unlike.

The same may be said of *People* v. *Life Union* (83 Hun,

598; affirmed, 145 N. Y. 606). In that case, as in the case in 131 N. Y., there was a reserve fund which was created by the appropriation of fifteen per cent of all the net assessments for mortuary and benefit purposes, and contained no provision by which the reserve fund was dedicated to the payment of death losses. We find nothing in either of the cases cited which is in conflict with the conclusion we have reached in this case.

It is doubtful if the question as to the claims of persons who hold bonds issued under their life reserve certificates, is before us. We are, however, of the opinion that they have no claim which can be paid by the receiver out of the funds in his hands. The contract between the parties was to the effect that the principal of such bonds was not available to pay future assessments until ten years after the issuing of the bonds. It was only then that the amount of the principal and interest of such bond was to be paid to the beneficiary in addition to the amount of the certificate. Hence, until the bonds became available to pay the assessments, the beneficiaries were not entitled to receive their amount in addition to the certificates of membership. Any interest or principal, which was not available for that purpose, was to be applied to increase the bonds issued at the next quadrennial apportionment to members of the association. We find nothing in the record to show that any of the bonds had become available for that purpose, and, therefore, conclude that none of the appellants, who held bonds issued on life reserve certificates, is entitled to be paid any portion thereof by the receiver either upon death claims, or in the distribution of the fund among the holders of such certificates.

As to the claims of persons holding life reserve policies, whether bonds were issued or not, we are of the opinion that the remainder of the reserve fund in the hands of the receiver, after paying the claims of general creditors, and claims based upon life reserve certificates, where the member died prior to the commencement of this action, should be distributed among the holders of life reserve certificates in proportion to the amount paid by each.

The appellant Dwyer contends that the assessment of July, 1892, was made for her benefit with others, and that a fund was thereby established which was expressly dedicated to the payment of the certificate held by her, and, therefore, a trust was created, and the funds thus collected were impressed with such trust to an extent which entitled her to payment of the amount of her certificate out of the funds in the hands of the receiver. It may be, if there was a fund in the hands of the receiver that was collected for the express purpose of paying that loss, that the principle contended for might apply. But the record shows that no portion of the money collected by that assessment reached the hands of the receiver. It was all expended by the corporation before that time, but in what manner or for what purpose does not appear. Moreover, there is nothing in the constitution, by-laws or certificate which appropriates money collected by assessment to the payment of any particular claim, or to the claims that are mentioned in the assessment. On the contrary, they seem to contemplate that a fund should always be kept on hand to meet claims as they arise, and that assessments should be made and collected in anticipation of death losses. Under the circumstances shown by the record in this case, and under the contract between the parties, we are unable to discover any principle under which it can be held that a trust in favor of Dwyer was impressed upon any portion of the moneys or fund that came into the hands of the receiver.

These considerations lead to the conclusion that the order of the General Term should be reversed, and the order of the Special Term affirmed, with costs to the receiver and one bill of costs to the appellants Spooner and Royce, to be paid out of the funds in the hands of the receiver.

All concur, except BARTLETT, J., who dissents on the ground that the General Term modification of the Special Term order was right, and HAIGHT, J., who dissents from Judge MARTIN's opinion and concurs in the views adopted by the referee.

Ordered accordingly.