ROBINSON v. MUTUAL RESERVE LIFE INS. CO.

SCOVILL v. SAME.

(Circuit Court, S. D. New York. December 28, 1909.)

1. INSURANCE (§ 72*)—MUTUAL ASSOCIATIONS—INSOLVENCY AND DISSOLUTION—DISTRIBUTION OF FUNDS.

A provision of a trust agreement, under which a mutual life association deposited a reserve fund, that in case of its dissolution the fund should be distributed among its members in proportion to the gross amount of assessments paid by them, respectively, cannot be enforced as against creditors, where the association is wound up in a state of insolvency.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 98; Dec. Dig. § 72.*]

2. INSURANCE (§ 72*)—MUTUAL ASSOCIATIONS—INSOLVENCY—ADMINISTRATION OF ASSETS.

Where the assets of an insolvent life insurance association are administered in a suit by creditors, the date at which claims should be ascertained is that of the appointment of receivers and when it ceases to do business.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 98; Dec. Dig. § 72.*]

3. INSURANCE (§ 72*)—MUTUAL ASSOCIATIONS—INSOLVENCY—ADMINISTRATION OF ASSETS.

A mutual benefit life association conducted business for a number of years on the assessment plan, creating a reserve fund, after which it reorganized as a level premium company, and thus for some years before its insolvency had two classes of policy holders. *Held*, that both classes remained members, and claimants for deaths occurring before the appointment of receivers in a suit to wind up its affairs became creditors; that, as between the two classes, claimants under assessment policies were alone entitled to payment from the reserve fund contributed by their class and kept separate, while death claimants under policies of the second class, the net reserve paid by whom could not be traced, with the balance remaining unpaid on claims of the first class, should be paid from the general assets, before claims of living members and pro rata with general creditors.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 98; Dec. Dig. § 72.*]

4. INSURANCE (§ 72*)—INSOLVENCY OF COMPANY—DISTRIBUTION OF ASSETS—DEBTS DUE TO STATE.

In winding up the affairs of an insolvent insurance company in a court of equity in New York, debts due the state for taxes, or otherwise, which are not given a preference by state law, or have not become a lien before the appointment of receivers, are not entitled to priority of payment over claims of general creditors.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 98; Dec. Dig. § 72.*]

In Equity. Suits by James C. Robinson and by Reuben O. Scovill, respectively, against the Mutual Reserve Life Insurance Company. On exceptions to report of special master. Exceptions overruled.

See, also, 162 Fed. 794, 798, 800.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

William Beverly Winslow, for complainants.

James Byrne, for receivers.

Nash & Jones, Sullivan & Cromwell, Thomas L. Feitner, Robert Van Iderstine, Sewell T. Tyng, Miles M. Dawson, John E. Ruston, John T. McGovern, John M. Scoble, Gilbert E. Roe, C. A. Mountjoy, and Page, Crawford & Tuska, for exceptants.

WARD, Circuit Judge. The special master has greatly aided the court by his lucid statement of a most complicated situation in his reports dated July 1 and December 14, 1909, and all the counsel are entitled to praise for the fair way in which they have co-operated to arrive as expeditiously as possible at the actual facts. In this way much time and expense have been saved for the benefit of persons who have fared very badly at the hands of the Association and of the Company. As I have concluded to sustain the master's findings of fact and conclusions of law, I will state as briefly as possible my views generally, and so dispose of the exceptions which apply to both reports without referring to them particularly.

After April 17, 1902, when the Association reorganized as a Company under the insurance law (chapter 722, Laws N. Y. 1901), it conducted the business of insurance in two different ways, viz.: Maintaining the policies theretofore issued on the assessment plan, and thereafter issuing policies solely on the level premium plan. It remained, however, the same company, was still a mutual company, and all its policy holders, whether on the assessment or level premium plan, were members, notwithstanding that they paid their premiums on different plans. The officers elected were the agents of all the members equally, and the holders of level premium policies were as much affected by and responsible for their acts as were the holders of assessment policies. Inasmuch as the vested contract rights of the assessment policy holders were not to be changed by the reorganization (Polk v. Mutual Reserve Fund Life Association, 207 U. S. 310, 28 Sup. Ct. 65, 52 L. Ed. 222), I think the proper way to have conducted business after April 17, 1902, would have been to have kept the accounts of the assessment and level premium policy holders separate. If this had been done, the situation would now be comparatively simple. But it was not done by the officers, who were the agents of both classes. The problem, therefore, is to ascertain to what extent the accounts of each class can be disentangled.

I will consider first the relations of the two classes of policy holders inter se, and afterwards their relation to the general creditors. The master has traced into the possession of the receivers February 15, 1908, certain assets which were a part of the reserve fund April 17, 1902. The agreement with the Central Trust Company as to the fund provided that upon dissolution of the corporation—

"it shall be divided amongst the members of the Association proportionately to the gross amount of assessments paid by said members respectively to said Association or shall be distributed in such other equitable manner as the courts shall direct." Robinson v. Mutual Reserve Life Insurance Co. (C. C.) 162 Fed. 798.

175 F.—40

The specific distribution provided for among the members evidently contemplated the winding up of the Association in a state of solvency. Such a distribution would have been between the parties valid, but not, I think, as against creditors. Inasmuch as the Company is insolvent, the fund must be distributed equitably, on the other alternative, viz., as the courts shall direct. I have no doubt that the date at which all claims should be ascertained is February 15, 1908, when the receivers were appointed. The Company was not then dissolved, but by its admission of insolvency and the appointment of receivers it was substantially dissolved, and claims should be fixed as of that date. It would be quite unreasonable to fix them as of April 19, 1907, the date the suit was begun, in analogy to an action by the Attorney General, under section 1785, Code Civ. Proc. N. Y., instituted for dissolution after a quasi judicial examination by a public official (section 80, Insurance Law [Consol. Laws, c. 28]), and followed by an injunction against doing business under section 1787, and the appointment of receivers under section 1789. People v. Commercial Alliance Life Ins. Co., 154 N. Y. 95, 47 N. E. 968. In an action for sequestration under section 1784, when the business continues, the time for fixing claims would doubtless be the adjudication of insolvency.

Coming, now, to the rights of the two classes of members inter se, I agree with the master that the claimants for deaths occurring before February 15, 1908, in both classes became creditors, and that death claimants under assessment policies should be first paid out of the reserve fund, because it was created by their assessments, was pledged to pay their death claims, for a long course of years had been so applied, and is now specifically identified. On the other hand, the net reserve paid by the level premium policy holders cannot be specifically traced into the free assets on hand. Death claimants under those policies, together with claimants under assessment policies (except 15-year policies, whose payment was restricted to the death and reserve funds and assessments), as to any balance not paid out of the reserve fund should be paid out of the free assets. People v. Life & Reserve Association, 150 N. Y. 94, 45 N. E. 8. Claims on disability policies maturing before February 15, 1908, when properly ascertained, are to be treated in exactly the same manner as death claims. This disposes of the living policy holders, whose claims did not mature before the appointment of receivers, because apparently nothing will be left for them.

Considering, now, the claims of the general creditors: Their claims did mature before February 15, 1908, and they, by services or supplies, obviously contributed to the maintenance of the company. At first sight it seems inequitable to deny them a preference over claims derived through persons who were then members of the company. But the beneficiaries under the death policies are not and never were members, and I discover no reason for discriminating between persons who are equally creditors pure and simple. The case of living legal reserve policy holders seems to me different. Although creditors, they were personally members at the time the claims of the general creditors matured against the Company. This is a reason why their claims should be subordinated to those of the general creditors. The ex-

penses of the receivership, however, should be first paid, apportioned between the reserve fund and the general assets in proportion to the amounts of the funds.

It is vigorously contended on behalf of the legal reserve death claimants that cash contributions of legal reserve policy holders to the amount of $492,478.56 applicable to the payment of legal reserve death claims had been applied to the payment of assessment death claims, and that therefore the legal reserve death claimants are entitled by subrogation to the benefit of the reserve fund to that amount, less their share of the expense of running the business. The master in his twenty-seventh finding of fact states that the expense of running the business, as distinguished from all other expenses, between April 17, 1902, and February 15, 1908, was $1,655,867.10. The legal reserve death claimants calculate the legal reserve policy holders' share of these expenses in the proportion that the outstanding assessment policies bore to the legal reserve policies in 1908. The share so ascertained would be $166,587.71, and they therefore claim the benefit of the reserve fund to at least the amount of $325,000. This method is inexact, because the expense of maintaining old business is obviously far less than the expense of getting new business. Examination of the items composing the expense shows that it was attributable almost entirely to the legal reserve business, certainly to an amount that would cover, several times over, the sum claimed to have been diverted.

Preference has been claimed for payment of services rendered by attorneys to the Company before the appointment of receivers. I see no ground for discriminating in favor of these claims, and leave them to come in pari passu with those of the general creditors. As to claims for preference in favor of services of attorneys in resisting the attempt to declare the Company to be insolvent, there may be a discretion (Barnes v. Newcomb, 89 N. Y. 108; People of New York v. Commercial Ins. Co., 148 N. Y. 563, 42 N. E. 1044), which is left for the consideration of the special master as to each claim presented to him.

Preference is also claimed by the Superintendent of Insurance for expenses connected with the examination of the Company under section 70, Insurance Law, and by the state for taxes on business done in the year 1907 under section 187 of the Tax Law, payable under section 194 upon the 1st day of June. These are debts to the sovereign; but neither is given any statutory preference, except that the taxes are made a lien upon the corporation's property from the time they became payable June 1st in each year. There is no doubt that at common law debts due the king have a preference, and the Court of Appeals in Matter of Receivership of Columbian Co., 3 Abb. Dec. 239, clearly intimated that the state succeeded fully to the prerogative of the crown, reiterated in the later case of Central Trust Co. v. New York City & Northern R. R. Co., 110 N. Y. 250, 18 N. E. 92, 1 L. R. A. 260. But in Wise v. Wise Co., 153 N. Y. 507, 511, 47 N. E. 788, Judge O'Brien expressly defined the cases in which this prerogative exists:

"In this country the right of the government to be preferred in the distribution of such a fund exists, under the authorities, in two cases: (1) Where the

preference is expressly given by statute, as was the case in U. S. v. State Bank of Nor. Car., 6 Pet. 29, 34 [8 L. Ed. 308]. (2) Where, before the fund has come to the hands of the receiver or trustee, a warrant or some other legal process has been issued for the collection of the tax or debt, and the fund has come to his hands impressed with a lien in favor of the government in consequence of the proceedings for collection, as was the case in the Columbian Ins. Co. Receivership, 3 Abb. Dec. 239."

In the Case of the Columbian Insurance Company where a preference was allowed, there was a lien for the taxes on the Company's property before receivers were appointed. In the case of Wise v. Wise Co., where a preference was denied, the taxes became due after the levy of an attachment. The case under consideration differs from the first in that there was no lien for the state's claim before receivers were appointed, and from the second in that the state does not ask for a preference over any prior specific lien. But Judge O'Brien's language in the later decision seems to me clearly to exclude the state from any preference in this case over the general creditors.

Margaret Moran obtained a judgment against the Company before the appointment of receivers for a death claim upon an assessment policy. Though the claim is now merged in the judgment, to be regarded as a debt, or perhaps a contract, I think a court of equity may inquire into the cause of action, and give the judgment the preference attaching to the policy on which the claim arose. It would be a hard rule to deprive a creditor of his preference because he was compelled by the resistance of the Company to pursue his claim to judgment.

The master properly excluded death claims of citizens and residents of foreign countries in which the government has sequestered deposits made by the Association and the Company for the benefit of the resident policy holders, and its free assets in banks, etc. It being found as a fact that the receivers have applied for the return of those funds for distribution here without avail, and that they are sufficient in amount to cover the death claims maturing in those countries before February 15, 1908, those claimants are properly relegated to the assets so sequestered. Presumably they will be paid in full. There is nothing to show that they have done anything to realize from the funds impounded abroad. It would not be fair to the domestic creditors either to postpone distribution until the foreign creditors have collected what they can abroad or to permit the foreign creditors to prove their claims in full here and leave the receivers to collect any surplus there may be coming to the domestic creditors from abroad. The time is approaching when the assets should be distributed and claimants should know exactly what they have to expect as the outcome of this unfortunate business.

All the exceptions to the master's report are overruled.